10 F.3d 1535
 62 USLW 2484
 Jessie Leon TITTLE, As Administrator of the Estate of
Stephen Warren Tittle, Plaintiff-Appellant,
Rebecca Alexander, as Administratrix of the Estate of Tom
Harrell, Plaintiff-Intervenor-Appellant,
v.
JEFFERSON COUNTY COMMISSION, David Orange, John Katopodis,
Reuben Davis, Jim Gunter, Chris McNair, Jefferson
County, Defendants-Appellees.
Giattina, Fisher & Co., Architects, Inc., Defendant,
 No. 91-7054.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 6, 1994.
 
 Clarence L. McDorman, Birmingham, AL, for R. Alexander.
 Jeffrey W. Bennitt, Kizer & Bennitt, Birmingham, AL, for Jessie Leon Tittle.
 Charles S. Wagner, Jeffrey M. Sewell, Jefferson County Attorney's Office, Birmingham, AL, for defendants-appellees.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before TJOFLAT, Chief Judge, FAY, KRAVITCH, HATCHETT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK and CARNES, Circuit Judges.
 COX, Circuit Judge:
 
 
 1
 Stephen Tittle and Tom Harrell committed suicide by hanging themselves in the Jefferson County Jail. Jessie Leon Tittle brought this 42 U.S.C. Sec. 1983 action as personal representative of the estate of Stephen Tittle, against Jefferson County, Alabama, alleging that the County violated Stephen Tittle's rights under the Eighth and Fourteenth Amendments to the Constitution. Rebecca Alexander, as personal representative of the estate of Tom Harrell, intervened in the action, alleging that the County also violated Tom Harrell's rights under the Eighth and Fourteenth Amendments. The plaintiffs contend that the County is responsible for the suicide deaths of Stephen Tittle and Tom Harrell. More specifically, the plaintiffs allege that the County violated the decedents' constitutional rights because the County failed both to correct its defectively designed jail cells and to provide for sufficient screening of inmates for suicidal tendencies.[1]
 
 
 2
 The district court granted the defendants' motion for summary judgment. The plaintiffs appealed. A panel of this court affirmed the district court's ruling as it relates to the plaintiffs' claim that the defendants failed to properly train the deputies responsible for screening inmates for suicidal tendencies, but reversed the district court's grant of summary judgment on the claim that those responsible for maintaining the jail were aware of a dangerous condition in the cells that created a strong likelihood that inmates would attempt, and likely succeed at, suicide. Tittle v. Jefferson County Comm'n, 966 F.2d 606 (11th Cir.1992). We vacated the panel opinion and granted rehearing en banc. Tittle v. Jefferson County Comm'n, 986 F.2d 1384 (11th Cir.1993). We now affirm the district court in all respects.
 
 I. FACTS[2]
 A. Stephen Tittle
 
 3
 On October 25, 1988, Birmingham police arrested Stephen Tittle for robbery. After Tittle was charged, authorities took him to the Jefferson County Jail. Jail personnel admitted Tittle according to standard procedures. Pursuant to those procedures, the medical personnel examined Tittle. In addition, a deputy sheriff filled out a form that included questions regarding a prisoner's suicidal tendencies. If a prisoner's answers demonstrated suicidal tendencies, the jail personnel were to place that prisoner in the medical ward of the jail for constant supervision. During Tittle's screening, he answered that he had never been under the care of a psychiatrist, had never attempted suicide, was not dependent on drugs or alcohol, was not using street drugs, and had no serious illness or injury. (R.1-62 at 5.) The deputy noted that Tittle exhibited no abnormal or unusual behavior. Based on the results of his screening, jail personnel placed Tittle in the general population of the jail.
 
 
 4
 In the early morning of October 28, 1988, a deputy observed Tittle sitting on the bunk in his cell. Approximately forty minutes later, that deputy checked Tittle's cell again and realized that Tittle was hanging from a bar across the window of the cell by a strip of bed sheet tied around his neck. The deputy could not enter the cell because he did not have an emergency key. He called for help, and personnel from the control room opened the cell. Paramedics were summoned, but they were not able to revive Tittle. Later, an inmate in the cell next to Tittle's reported that he had heard a gasping sound from Tittle's cell earlier that night. The coroner's report confirmed that Tittle had died approximately four hours before he was discovered.
 
 B. Tom Harrell
 
 5
 On February 10, 1989, after being charged with violating the terms of his parole, Tom Harrell was placed in the Jefferson County Jail. He was screened under the same procedures as Tittle. He was examined by the jail health service. The deputy who filled out the questionnaire for Harrell reported that Harrell had never been under the care of a psychiatrist nor attempted suicide, was not dependent on alcohol or drugs, was not taking any medication prescribed by a physician and had no serious illness or injury. (R.1-62 at 19.) The deputy noted that Harrell exhibited no abnormal or unusual behavior. Harrell was placed in the general population of the jail.
 
 
 6
 A deputy found Harrell dead in his cell on February 18, 1989. Harrell had hanged himself using a bed sheet and the bar across the window of his cell. The deputy on duty had seen Harrell alive approximately forty minutes earlier. The deputy who found Harrell could not enter the cell because he did not have an emergency key. Control room personnel opened the door to the cell. The jail medic administered CPR until paramedics arrived. The paramedics were unable to revive Harrell, and they pronounced him dead eighteen minutes after the deputy discovered him hanging from the pipe in the cell window.
 
 
 7
 Contrary to what Harrell reported to the screening deputy, he had been under the care of a psychiatrist and had previously attempted suicide. In addition, Billy Cox reported by affidavit that he had been a friend of Harrell's since childhood and that he knew Harrell at the time of Harrell's prior suicide attempt. Cox said that Harrell had called him while Harrell was incarcerated at the Jefferson County Jail. According to Cox, when Harrell called him, he seemed upset and would "start talking crazy like he did before when he tried to commit suicide." (R.2-105 at 8.) Cox also said that he called the jail the week that Harrell committed suicide and told someone at the jail that Harrell had previously attempted suicide and that the deputies should watch him carefully because Harrell might again try to kill himself. (Id.)
 
 C. Suicide Prevention Policy
 
 8
 At the time of Tittle's and Harrell's suicides, Sheriff Mel Bailey used a written manual, which included a chapter on suicide prevention, as an aid in training the deputies employed at the jail. The manual also included written policies concerning the admission of psychotic prisoners and suicide prevention. The Sheriff required each deputy to take and pass a test on the entire manual. Additionally, the Sheriff had in place the screening system employed by the deputies who processed Tittle and Harrell. Moreover, prisoners were subjected to a medical examination before entering either the medical ward or the general population. According to Errol Hall, the medical examiner at the jail, any deputy who receives a complaint regarding a psychological problem of any prisoner must call that complaint to the attention of someone on the medical staff, who must then evaluate the inmate. (Hall Deposition, R.2-102 at 18.)
 
 D. Jail Construction
 
 9
 Construction of the Jefferson County Jail was a joint project of the Sheriff's Department and the County. During the construction planning, representatives of the County attended several meetings in which the construction of the windows in the cells was discussed. (See R.2-99-Exh. 6 at p 12 (Minutes of Meeting, April 15, 1982).) The minutes of the meetings offered by the plaintiffs do not contain any discussion of the possibility of suicide by use of the pipe in cell windows.
 
 E. History of Suicide Attempts and Suicides
 
 10
 Captain Latta of the Sheriff's Department, who is in charge of daily operation of the jail, recorded the suicides and attempted suicides occurring between October 1987 and December 1989 in the jail. (Latta Deposition, R.2-103 at 11.) Captain Latta kept records in an endeavor to determine whether the jail had a serious problem with suicides. (Id.) The record is silent on the question of whether any County representative knew, prior to Harrell's suicide, about any of the suicide attempts or suicides.
 
 
 11
 Captain Latta's records show that between October 19, 1987, and February 18, 1989, the date of Harrell's suicide, there were twenty-seven suicide attempts and two suicides in the jail, including Tittle's. (R.2-99-Exh. 2.) Tittle and the other inmate who committed suicide before Harrell hanged themselves. The record does not reveal whether the individual who committed suicide before Tittle used the pipe in the cell window to hang himself.
 
 II. ISSUE ON APPEAL
 
 12
 The plaintiffs contend that the district court erred in granting summary judgment in favor of the County. We review a district court's grant of summary judgment de novo. Hoffman v. Allied Corp., 912 F.2d 1379, 1383 (11th Cir.1990). On review, we are bound by the same standards that governed the district court on the summary judgment motion below. Earley v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir.1990). Any factual disputes must be resolved in favor of the nonmoving parties. Barnes v. Southwest Forest Indus., 814 F.2d 607, 609 (11th Cir.1987).
 
 III. CONTENTIONS OF THE PARTIES
 
 13
 The plaintiffs contend that (1) the County's policies of inadequate screening for suicidal tendencies and inadequate supervision, (2) the County's provision of convenient tools that could be used for suicide, and (3) the County's failure to correct those conditions violated Stephen Tittle's and Tom Harrell's constitutional rights, and caused their deaths. Jesse Tittle contends that the County had two opportunities to become aware of Stephen Tittle's potential for suicide. First, Jesse Tittle notes that Stephen had been released from a Florida prison just prior to his arrest for robbery. Implicit in Tittle's argument is the suggestion that the second arrest portended depression and thus, represented notice that Stephen was a suicide risk. Second, Jesse Tittle contends that Stephen Tittle's brothers spoke with him while he was in jail, noticed that he was depressed and asked a deputy to watch him. Similarly, Alexander argues that the County should have known that Harrell was potentially suicidal because he had attempted suicide by overdose two years earlier and the relevant hospital records were available to the jail personnel. Alexander also contends that the County had actual notice of Harrell's potential for suicide given the telephone call from Billy Cox informing someone at the jail that Harrell might attempt suicide.
 
 
 14
 The County contends that it cannot be held liable under a respondeat superior theory for the jail personnel's alleged failure to gain knowledge of either Tittle's or Harrell's potential for suicide or for their failure to act on that knowledge. Furthermore, the County notes that both decedents were screened by jail medical personnel and that neither exhibited suicidal tendencies. To hold the County responsible for their deaths under these circumstances, the County argues, would require the County to assume all prisoners are suicidal and to build a suicide-proof jail.
 
 IV. DISCUSSION
 
 15
 The plaintiffs contend that the County violated the decedents' rights under the Eighth and Fourteenth Amendments. Whether the alleged violation is reviewed under the Eighth or Fourteenth Amendment is immaterial because "[i]n a prisoner suicide case, to prevail under section 1983 for violation of substantive rights, under either the eighth or fourteenth amendment, the plaintiff must show that the jail official [defendant] displayed 'deliberate indifference' to the prisoner's taking of his own life." Edwards v. Gilbert, 867 F.2d 1271, 1274-75 (11th Cir.1989) (citations omitted).[3] In the instant case, the evidence does not support the contention that the County acted with deliberate indifference vis a vis the decedents. Because that infirmity is fatal to the plaintiffs' case, we limit our discussion to that question.
 
 
 16
 Deliberate indifference, in the context of a jail suicide case, is a question of whether a defendant was deliberately indifferent to an individual's mental condition and the likely consequences of that condition. Wright v. Wagner, 641 F.2d 239, 242 (5th Cir. Unit A March 1981).[4] Moreover, in this circuit a finding of deliberate indifference requires that officials have notice of the suicidal tendency of the individual whose rights are at issue in order to be held liable for the suicide of that individual. Popham v. City of Talladega, 908 F.2d 1561, 1564 (11th Cir.1990) (noting that "[a]bsent knowledge of a detainee's suicidal tendencies, the cases have consistently held that failure to prevent suicide has never been held to constitute deliberate indifference.")[5] In Schmelz v. Monroe County, 954 F.2d 1540, 1545 (11th Cir.1992), this court explained that "[n]o matter how defendants' actions might be viewed, the law in this circuit makes clear that they cannot be liable under Sec. 1983 for the suicide of a prisoner 'who never had threatened or attempted suicide and who had never been considered a suicide risk.' " (quoting Edwards, 867 F.2d at 1277).[6] Finally, this court finds that deliberate indifference can only be established where a plaintiff demonstrates a " 'strong likelihood, rather than a mere possibility,' " that suicide would result from a defendant's actions or inaction. Edwards, 867 F.2d at 1276 (citations omitted). Thus, the mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners. See Popham, 908 F.2d at 1564.
 
 
 17
 The plaintiffs advance two lines of argument. First, the plaintiffs contend that the policies to prevent inmate suicide that were in place at the jail at the time of Tittle's and Harrell's suicides were so inadequate as to constitute a violation of the decedents' constitutional rights.[7] We disagree.
 
 
 18
 As to the plaintiffs' first argument, they have not shown that the policies demonstrate deliberate indifference to the rights of Tittle and Harrell. The plaintiffs have pointed to what they perceive to be weaknesses in the screening process, the training of deputies and the supervision of prisoners; however, these alleged weaknesses, without more, do not amount to a showing of deliberate indifference toward the rights of prisoners. See, e.g., Popham, 908 F.2d at 1564-65 (rejecting a claim of official liability for failure to train jail personnel to screen detainees for suicidal tendencies absent a showing of deliberate indifference).
 
 
 19
 Similarly, the plaintiffs' assertions that certain individuals warned deputies at the jail about the mental states of the decedents adds nothing to the plaintiffs' claims against the County. Counties may be liable for violations of constitutional rights only when such violations occur as a result of an official county policy. See Monell v. Dep't of Social Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); Parker v. Williams, 862 F.2d 1471, 1477 (11th Cir.1989). This requirement is to assure that county liability occurs only when the county is actually responsible for the injury. See Pembaur v. City of Cincinnati, 475 U.S. 469, 479, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). Thus, Jefferson County cannot be liable under a respondeat superior theory for the acts and omissions of jail personnel that were contrary to County policy, even if the deputies are properly considered agents of the County. See Monell, 436 U.S. at 691, 98 S.Ct. at 2036.
 
 
 20
 The plaintiffs' second contention is that the County is liable for the deaths of Tittle and Harrell because it built a defective jail and failed to remedy that defect. The plaintiffs cite no authority that supports the argument that the occurrence of two suicides and twenty-seven attempted suicides in the jail requires County officials to conclude that all prisoners of the Jefferson County Jail are substantially likely to attempt suicide. This infirmity of the plaintiffs' case is significant because "[t]he deliberate indifference standard is met only if there were a 'strong likelihood, rather than a mere possibility,' that self-infliction of harm would result" from the defendant's actions or inaction. Edwards, 867 F.2d at 1276. (citations omitted). The fact that one suicide occurred before Tittle committed suicide and two suicides occurred before Harrell committed suicide, without more, did not increase the possibility of suicide to a strong likelihood.
 
 
 21
 For these reasons, we reject the plaintiffs' contention that the district court erred in granting summary judgment in favor of the defendants.
 
 
 22
 AFFIRMED.
 
 
 23
 KRAVITCH, Circuit Judge, concurring in part and concurring in the judgment:
 
 
 24
 I join the court's opinion insofar as it relates to the issue of inadequate screening and supervision. I do not join that portion of the opinion rejecting plaintiffs' claims regarding the horizontal pipes in Tittle's and Harrell's cells. The majority today announces a per se rule: "Deliberate indifference, in the context of a jail suicide case, is [solely] a question of whether a defendant was deliberately indifferent to an individual's mental condition and the likely consequences of that condition." Ante, at 1539. Hence, deliberate indifference to a dangerous jail condition that invited and facilitated the decedent's suicide cannot itself form the basis of an Eighth Amendment claim. This holding absolves jail authorities of responsibility for features of their jails which they know contribute substantially to detainee suicides. In my view, such willful indifference to the deaths of persons in state custody is antithetical to fundamental constitutional principles.
 
 
 25
 Moreover, the majority's holding is unnecessary to resolve the controversy before the court. "The record is silent on the question of whether any County representative knew, prior to Harrell's suicide, about any of the suicide attempts or suicides." Ante, at 1538. Thus, plaintiffs failed to establish a jury question on whether the Commission exhibited deliberate indifference to a dangerous condition in the decedents' cells.
 
 
 26
 For the reasons below, therefore, on the issue of the dangerous condition of confinement I respectfully concur in the court's judgment only.
 
 I.
 
 27
 A proper claim for damages under the Eighth Amendment requires proof of two distinct elements: a subjective component and an objective component. Hudson v. McMillian, --- U.S. ----, 112 S.Ct. 995, 999-1000, 117 L.Ed.2d 156 (1992); LaMarca v. Turner, 995 F.2d 1526, 1535 & n. 17 (11th Cir.1993). The subjective component asks whether the defendant had a sufficiently culpable state of mind so that his alleged wrongdoing amounted to punishment of the prisoner. The objective component tests whether that punishment is objectively harmful enough to violate the Constitution. Hudson, --- U.S. at ----, 112 S.Ct. at 999; Wilson v. Seiter, 501 U.S. ----, ----, 111 S.Ct. 2321, 2326, 2329, 115 L.Ed.2d 271 (1991). Each component raises a discrete issue which a reviewing court must consider separately.[1]
 
 
 28
 To evaluate the subjective component, the court assumes that the harm or risk about which the plaintiff complains is serious enough to transgress the Constitution. The only question is whether the defendant acted with an unconstitutionally culpable, or wanton, state of mind. The test for wantonness is whether the defendant exhibited deliberate indifference to the asserted harm or risk. See Wilson, 501 U.S. at ----, 111 S.Ct. at 2327.
 
 
 29
 To establish deliberate indifference, "plaintiff must prove that the [defendant] possessed knowledge both of the infirm condition and of the means to cure that condition, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." LaMarca, 995 F.2d at 1536 (quotation omitted). With a municipal defendant, this knowledge must be so pervasive that the refusal to prevent harm rises to the level of a custom or policy of depriving inmates of their constitutional rights. See, e.g., City of Oklahoma City v. Tuttle, 471 U.S. 808, 817, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985). In this case, therefore, plaintiffs had to present evidence that the Commission was "aware of the number of suicides in the [county] lockup[ ] and of the alternatives for preventing them, but either deliberately chose not to pursue these alternatives or acquiesced in a longstanding policy or custom of action in this regard." Simmons v. City of Philadelphia, 947 F.2d 1042, 1064 (3d Cir.1991) (Becker, J.), cert. denied, --- U.S. ----, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992).
 
 
 30
 The record does not indicate that any member of the Commission had actual knowledge prior to the deaths of Tittle and Harrell that inmates were attempting suicide at a frightening rate, much less that the horizontal pipes had become their suicide-tool of choice. Although the record shows that Sheriff Melvin Bailey informed Commission members about an acute suicide problem and the close causal connection between that problem and the horizontal pipes, that correspondence began after Harrell's suicide in February 1989.[2] Thus plaintiffs failed to establish a jury question on whether the Commission was deliberately indifferent to Tittle's and Harrell's rights. As such, the district court did not err when it granted summary judgment in favor of the Commission.
 
 II.
 
 31
 Plaintiffs' failure to create a jury question on the subjective component of their claims should obviate the need for the court to address the more difficult issue of constitutional law presented in this case--whether jail authorities' failure to remove from inmates' cells items they know invite and facilitate suicide is sufficiently harmful to violate the Eighth Amendment's objective component. See Superintendent, Massachusetts Corr. Inst. v. Hill, 472 U.S. 445, 450, 105 S.Ct. 2768, 2771, 86 L.Ed.2d 356 (1985) ("[W]e will not address [a] constitutional question unless it is necessary to the resolution of the case before the Court."). Nevertheless, the majority hinges its judgment on this unessential constitutional question, holding that the failure to remove known implements of suicide never offends the Eighth Amendment absent deliberate indifference to an individual inmate's suicidal tendencies. Because I believe that the majority's conclusion on this point is seriously in error, I am impelled also to discuss the objective component of plaintiffs' claims.
 
 A.
 
 32
 Plaintiffs in jail suicide cases typically allege that the decedent was suicidal while in the defendants' custody and that the defendants exhibited deliberate indifference to the decedent's serious need for anti-suicide intervention. See, e.g., Hardin v. Hayes, 957 F.2d 845, 846, 851 (11th Cir.1992); Murphy v. Lane, 833 F.2d 106, 107 (7th Cir.1987). The logical rule in these cases is that, to be liable, the defendants must have ignored the decedent's suicidal manifestations. Here, however, plaintiffs claim that the defendants were deliberately indifferent not only to the decedents' psychological needs but to a particular, dangerous physical condition of their confinement, a condition wholly within the defendants' control. Rather than evaluate plaintiffs' distinct constitutional claims pursuant to the Supreme Court's settled Eighth Amendment framework, the majority simply files them under the overbroad heading of "jail suicide cases." It then applies to those claims the rule applicable in the typical jail suicide case: that to prevail, the plaintiff must show that the defendants were deliberately indifferent to the individual's likelihood of committing suicide. In my view, separate analysis of plaintiffs' claims leads to the conclusion that the Eighth Amendment is in fact implicated by dangerous conditions of confinement that entice and facilitate the commission of suicide, regardless of whether the inmate manifested suicidal tendencies.
 
 B.
 
 33
 To evaluate the objective component of an Eighth Amendment claim we assume the defendant exhibited deliberate indifference to the risk about which the plaintiff complains. The narrow question is: Does exposing detainees to such a risk violate contemporary standards of decency? Helling v. McKinney, --- U.S. ----, ----, 113 S.Ct. 2475, 2482, 125 L.Ed.2d 22 (1993).
 
 
 34
 The right to safe confinement "constitutes a 'historic liberty interest,' " guaranteed by the Constitution. Youngberg v. Romeo, 457 U.S. 307, 315, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982) (quoting Ingraham v. Wright, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977)). Thus the Supreme Court has held that dangerous prison conditions may satisfy the objective component of an Eighth Amendment claim. E.g., Helling, --- U.S. at ----, 113 S.Ct. at 2480; see LaMarca, 995 F.2d at 1535. This is true even though the harm the conditions cause will occur only in the future. See Helling, --- U.S. at ----, 113 S.Ct. at 2480. Nor does it matter that some inmates may not be affected by the condition, and that the harm is thus, in a sense, only potential harm. The Court has found an Eighth Amendment violation "even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed." Helling, --- U.S. at ----, 113 S.Ct. at 2480 (citing Hutto v. Finney, 437 U.S. 678, 682, 98 S.Ct. 2565, 2569, 57 L.Ed.2d 522 (1978)).
 
 
 35
 The essence of a dangerous-condition claim is the defendant's failure to furnish "[r]easonable safety," which the Court has held to be a "basic human need[ ]." E.g., DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989). Jail authorities fail to provide for the reasonable safety of inmates when they ignore a strong likelihood that a condition of confinement will contribute substantially to serious injury. See, e.g., Manarite v. City of Springfield, 957 F.2d 953, 956 (1st Cir.) (holding that strong likelihood, not mere possibility, that harm will occur is required), cert. denied, --- U.S. ----, 113 S.Ct. 113, 121 L.Ed.2d 70 (1992). A strong likelihood may be shown by evidence that harm or injury which is attributable to a jail condition frequently has recurred.
 
 
 36
 The alleged wrongdoing in this case is the county's failure to remove from its jail cells a convenient and inviting tool for committing suicide. In my opinion, this failure would be sufficiently harmful to transgress the Eighth Amendment. The legal literature is filled with tragic proof that incarceration often is followed by attempted and successful suicides.[3] Because "[s]uicide is a real threat in the custodial environment," Rhyne v. Henderson County, 973 F.2d 386, 396 (5th Cir.1992) (Goldberg, J., concurring), it is inconsistent with the "basic human need" of reasonable safety knowingly to furnish detainees with items it has been shown they are substantially likely to use to commit suicide--whether those items be razor blades, nooses, or horizontal pipes. Of course, authorities may not know when they build a jail that certain of its features provide inmates with a convenient and enticing means of committing suicide. But that fact is relevant only to the issue of deliberate indifference--to the subjective component of an Eighth Amendment claim. As for the objective component, if and when the authorities discover a nexus between their jails and inmate suicides--when, for example, they become aware that several suicides have occurred--they must, in my view, take appropriate steps to remedy the problem. "Contemporary standards of decency require no less." Helling, --- U.S. at ---- - ----, 113 S.Ct. at 2480-81.[4]
 
 
 37
 The present case illustrates a situation in which inmates were substantially likely to use a county-provided tool to commit suicide.[5] From October 20, 1987 to December 29, 1989, fifty-seven suicide attempts and four suicides occurred in the Jefferson County Jail.[6] All four deaths and twenty-nine of the attempts were accomplished by hanging,[7] most from the horizontal pipes in the inmates' cells. A prison expert opined that the horizontal bar was "an open invitation to anyone considering suicide."[8] From this evidence a jury could find that the pipes were sufficiently dangerous to overstep the Eighth Amendment's objective boundaries. Thus I believe that the majority errs when it holds that the only harm actionable in jail suicide cases is the disregard of a particular inmate's suicidal tendencies.
 
 C.
 
 38
 The majority's holding is based entirely upon four Eleventh Circuit cases which declare that defendants "cannot be liable under Sec. 1983 for the suicide of a person 'who never had threatened or attempted suicide and who had never been considered a suicide risk.' " Schmelz v. Monroe County, 954 F.2d 1540, 1545 (11th Cir.1992) (quoting Edwards v. Gilbert, 867 F.2d 1271, 1277 (11th Cir.1989)); accord Popham v. City of Talladega, 908 F.2d 1561, 1564 (11th Cir.1990); Wright v. Wagner, 641 F.2d 239, 242 (5th Cir. Unit A March 1981).[9] But those cases are inapposite. Unlike today's plaintiffs, the plaintiffs there did not allege that the defendants ignored a dangerous condition of confinement which aided and abetted their decedents' suicides. See, e.g., Edwards, 867 F.2d at 1276 (involving claim that jailers failed to "prevent" victim's suicide). Consequently, those cases tell us nothing about whether dangerous jail conditions that facilitate inmate suicides are sufficiently harmful to violate the objective component of the Eighth Amendment. To be sure, the cases' sweeping statements purport to apply in all "jail suicide cases." As to those cases in which the plaintiff alleges a dangerous condition of confinement, however, those statements are mere dicta. See United States v. Hogan, 986 F.2d 1364, 1372 (11th Cir.1993).
 
 
 39
 There are good reasons to treat the claims presented in the instant case differently from the claims in the cases the majority cites, and to hold that a dangerous-condition claim may lie when an inmate commits suicide notwithstanding the defendant's lack of knowledge that the particular inmate was suicide prone. Most important, the two claims stem from different theories of constitutional liability, each recognized by the Supreme Court. The claims raised in the majority's cases derive from Estelle v. Gamble, 429 U.S. 97, 110-11, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), which held that jail authorities may not ignore an inmate's serious medical needs. See, e.g., Popham, 908 F.2d at 1563. The claims presented here, in contrast, are more analogous to those recognized in Wilson v. Seiter and Helling v. McKinney. In those cases the Court held that the Eighth Amendment forbids jail authorities to exhibit deliberate indifference to a dangerous prison condition. See, e.g., Helling, --- U.S. at ----, 113 S.Ct. at 2480 (citing Wilson, 501 U.S. at ----, 111 S.Ct. at 2327). In the cases cited by the majority, it was alleged that the defendants failed merely to prevent the victim's suicide, by ignoring the decedent's mental problems. In dangerous-condition cases, the defendants play a broader and more affirmative role: supplying an instrument with which the inmate can take his own life, in addition to ignoring the existence of that condition.
 
 
 40
 Understanding that a jail suicide case may be more analogous to a condition-of-confinement case than a deprivation-of-medical-needs case is crucial to a court's analysis of the issue raised by the instant action. This court recently has held that deliberate indifference to a particular inmate's risk is not necessary to establish a condition-of-confinement claim. In LaMarca v. Turner, "[t]he plaintiffs [did] not argue that [defendant] knew of specific threats to their safety. Rather, they argue[d] that [defendant] failed to ensure their protection from the general danger arising from a prison environment that both stimulated and condoned violence." 995 F.2d at 1535 (emphasis added). The court held that although this theory of liability creates substantial obstacles to plaintiffs' claims, those obstacles are "not insurmountable." Id. Today's majority, to the contrary, holds that the failure to show that the defendants knew a dangerous condition posed a specific threat to a particular inmate is fatal to a jail suicide claim; the general danger emanating from a condition that facilitates suicide is never sufficient to establish liability. Today's opinion thus stands in direct conflict with the holding in LaMarca.
 
 
 41
 The jail suicide situation is somewhat different from other dangerous-condition cases in that the condition causes injury only in conjunction with a psychological predisposition personal to the detainee. This distinction, however, does not by itself render the furnishing of suicide tools less objectively harmful for constitutional purposes. Even in ordinary condition-of-confinement cases inmates suffer differently, or not at all, based on their individual characteristics and susceptibilities. In Helling, for example, the Court held that the presence of environmental tobacco smoke might constitute an unconstitutional condition of confinement. Yet some inmates are affected by smoke more than others. Furthermore, it is well established that an individual in custody has a right to medical care even if his injuries were self-inflicted. E.g., Edwards, 867 F.2d at 1276. If a municipality must treat self-inflicted injuries after the fact, then a fortiori it may not assist inmates who may have a propensity to injure themselves by knowingly giving them the tools with which to take their own lives. The Supreme Court has held that not every inmate exposed to a dangerous condition must suffer injury for the condition to violate the Eighth Amendment. See Helling, --- U.S. at ----, 113 S.Ct. at 2480. Hence, it is not an absolute bar to an Eighth Amendment claim that only those inmates with psychological problems will be injured by the presence in their cells of tempting instruments of suicide. A risk is harmful enough to transgress the Eighth Amendment's objective limits when a strong likelihood exists that a constitutionally intolerable number of deaths will occur in the county's jail.
 
 
 42
 The majority's reasoning would permit the county to equip its jail cells forever with implements of suicide, fully immunized from liability, regardless of the number of suicides that actually occur.[10] In a similar Third Circuit case Judge Becker recently wrote:
 
 
 43
 [I]t is constitutionally untenable that the City could, without preventive measures, permit 200 individuals to kill themselves each and every year while in temporary police detention for the minor infraction of public intoxication. This is not to say that it would be constitutionally impermissible for the City, as a result of costs or other factors relating to a legitimate countervailing governmental interest, to tolerate some relatively smaller number of yearly suicides. I simply emphasize that an exclusive focus on probabilities of individual harm masks the reality that, across the entire group of intoxicated detainees, a predictable number of actual individuals will kill themselves each year as a result of suicidal tendencies that have not been attended to--and that individual probabilities therefore are a misleading measure of the totality of the constitutional injury suffered by the particular group.
 
 
 44
 Simmons, 947 F.2d at 1070-71 (emphasis added).
 
 
 45
 The same is true here. If the authority responsible for maintaining safe jail conditions knows that inmates are using a particular feature of the jail to commit suicide time after time, the Constitution demands corrective action, absent overriding, legitimate governmental interests. The majority's per se rule that deliberate indifference to the particular inmate's suicidal tendencies is required to make out an Eighth Amendment violation is insupportable.[11]
 
 III.
 
 46
 [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being.... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs--e.g., food, clothing, shelter, medical care, and reasonable safety--it transgresses the substantive limits on state action set by the Eighth Amendment....
 
 
 47
 DeShaney, 489 U.S. at 199-200, 109 S.Ct. at 1005-06 (emphasis added). In my view, the majority's holding regarding the horizontal pipes undermines these cardinal principles. I would hold that a plaintiff may establish a claim under the Eighth Amendment by showing that the defendant furnished the decedent with an accessible and inviting instrument of suicide; that inmates used the tool with sufficient frequency, thereby demonstrating that it was unreasonably dangerous; and that the defendant exhibited deliberate indifference to the existence of the dangerous condition. Accordingly, on the issue of the dangerous condition I concur in the court's judgment only.
 
 ANDERSON, Circuit Judge, concurring specially:
 
 48
 I concur in the result.
 
 
 
 [1]
 The named defendants also include the Jefferson County Commission and individual members of the commission in their official capacities. For all purposes other than name, however, a suit against individuals in their official capacities is a suit against the governmental entities they represent. Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); Owens v. Fulton County, 877 F.2d 947, 951 n. 5 (11th Cir.1989). In this case, that governmental entity is Jefferson County, Alabama
 Originally, the plaintiffs named the architects who designed the jail, Giattina, Fisher & Co., Architects, Inc., as defendants. The architects are no longer parties to this action because the district court dismissed the claims against them without prejudice to the plaintiffs' rights to pursue such claims in state court. (R.1-11)
 
 
 [2]
 The facts stated are undisputed unless otherwise noted
 
 
 [3]
 Tittle was a pretrial detainee when he committed suicide. It is well settled that the Eighth Amendment prohibitions against cruel and unusual punishment do not apply to pretrial detainees. See Ingraham v. Wright, 430 U.S. 651, 671-72 n. 40, 97 S.Ct. 1401, 1412-13 n. 40, 51 L.Ed.2d 711 (1977). Harrell's status is more problematic. Harrell was being held pending a hearing for an alleged violation of parole. As noted herein, whether Harrell can properly pursue his claim under both the Eighth and Fourteenth Amendments need not be decided
 
 
 [4]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981
 
 
 [5]
 For example, in Edwards, the prisoner had, like Tittle and Harrell, hanged himself with a bed sheet. We reversed the denial of summary judgment for the defendants because the defendants did not know that the inmate was a suicide risk. Edwards, 867 F.2d at 1275-77
 
 
 [6]
 The Third Circuit has held that if jail officials' actions demonstrate deliberate indifference to a group of individual prisoners who are intoxicated and potentially suicidal, then they may be liable for the suicide of an individual member of that group. Simmons v. City of Philadelphia, 947 F.2d 1042 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992). We do not, in this case, decide whether a governmental entity may be liable for its deliberate indifference to a group of individuals who are potentially suicidal because the case before us does not present that circumstance. The plaintiffs' evidence of prior suicides and attempts in the Jefferson County Jail is insufficient to require the County to presume that all persons imprisoned there are substantially likely to attempt suicide
 
 
 [7]
 As we find that the policies in effect when Tittle and Harrell committed suicide were not constitutionally infirm, we do not reach the question of whether the sheriff's prisoner suicide prevention policy for the jail is an exercise of county authority
 
 
 [1]
 In addition, for liability under 42 U.S.C. Sec. 1983, the plaintiff must show "an affirmative causal connection between the actions taken by a particular person 'under color of state law' and the constitutional deprivation." LaMarca, 995 F.2d at 1538 (quotation and citation omitted). The Commission does not dispute that such a connection exists between the county's maintenance of its jail cells and the alleged deprivations in this case
 
 
 [2]
 Harrell died on February 19, 1989. The earliest correspondence in the record is a February 22, 1989 letter from Sheriff Bailey to County Commissioner John Katopodis. Bailey wrote the letter in response to a February 20, 1989 letter from the commissioner to the sheriff asking what could be done to address the suicide problem. Although the February 20 letter might indicate that the Commission knew about the problem prior to Harrell's death, it is not in the record. Consequently, we do not know its precise contents or whether it would have revealed an earlier awareness about the suicides and the horizontal pipes' connection to them
 
 
 [3]
 See, e.g., Hudson v. Palmer, 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984) (citing statistics including 125 suicides in federal prisons in one and one-half years during 1981-82); Rhyne v. Henderson County, 973 F.2d 386, 388 (5th Cir.1992) (jail suicide case); Bowen v. City of Manchester, 966 F.2d 13, 15 (1st Cir.1992) (same); Schmelz v. Monroe County, 954 F.2d 1540, 1545 (11th Cir.1992) (same); Barber v. City of Salem, 953 F.2d 232, 233 (6th Cir.1992) (same); Rellergert v. Cape Girardeau County, 924 F.2d 794, 797 (8th Cir.1991) (same); Buffington v. Baltimore County, 913 F.2d 113, 116 (4th Cir.1990) (same), cert. denied, 499 U.S. 906, 111 S.Ct. 1106, 113 L.Ed.2d 216 (1991); Nat'l Center on Institutions & Alternatives, And Darkness Closes In ... National Study of Jail Suicides ii (1981) (reporting 419 suicides in U.S. jails in 1979), cited in Charles M. Holt, Note, Sheriff's Liability for Prisoner Suicide: Helmly v. Bebber, 64 N.C.L.Rev. 1520, 1520 n. 1 (1986)
 
 
 [4]
 This is not to say that the authorities always must remove the offending condition. They simply must take "appropriate steps." Those measures may fall short of complete removal when sufficient, legitimate countervailing governmental interests exist
 
 
 [5]
 Or, at least, the evidence was sufficient for a reasonable jury to so find
 
 
 [6]
 R.2-101, Plf. exh. 9
 
 
 [7]
 Id
 
 
 [8]
 R.2-98, exh. 1(a), at 2 (affidavit of Gordon C. Kamka, Jail Specialist, West Virginia Supreme Court of Appeals)
 
 
 [9]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as circuit precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981
 
 
 [10]
 True, a plaintiff still could prevail if the defendants acted with deliberate indifference to his decedent's suicidal tendencies. But the reality is that many inmates attempt to kill themselves, and many succeed, without manifesting to their jailers any suicidal intentions. If the defendants are aware of this fact and choose to do nothing about it, they should be liable for their recalcitrance under the Eighth and Fourteenth Amendments
 
 
 [11]
 The majority attempts to distinguish Simmons by declaring that
 [w]e do not, in this case, decide whether a governmental entity may be liable for its deliberate indifference to a group of individuals who are potentially suicidal because the case before us does not present that circumstance. The plaintiffs' evidence of prior suicides and attempts in the Jefferson County Jail is insufficient to require the County to presume that all persons imprisoned there are substantially likely to attempt suicide.
 Ante, at 1544 n. 6. In the first place, Simmons did not involve an allegation of deliberate indifference to a group of individuals. Like this case, Simmons involved the claims of the personal representative of the estate of an individual who hanged himself in a municipal lockup. 947 F.2d at 1048. The reference to the "injury suffered by the particular group" merely reflects the fact that a condition-of-confinement claim is, by its very nature, an allegation of harm to a group of inmates. Most "conditions" apply generally to members of the jail population; they are not deprivations targeted at a particular detainee. To evaluate the dangerousness of a condition it is proper to consider the harm experienced by the group exposed to it. As for the majority's statement that the evidence is insufficient to presume that all Jefferson County inmates are substantially likely to attempt suicide, suffice it to reiterate that the Eighth Amendment's proscriptions are not limited to such a circumstance. As discussed above, the Supreme Court has squarely rejected the notion that all inmates exposed to a condition must be likely to suffer injury from it for the condition to be sufficiently dangerous to implicate the Eighth Amendment.
 The Commission asserts in effect that imposing liability when the defendants did not know about the particular inmate's suicidal tendencies would be tantamount to requiring "suicide proof" jails. This is wrong. At most it would require making a few modest changes in cell design to remedy a defect that has been shown over and over to provide a convenient tool for committing suicide.