**Miranda Lavette HOLLAND, etc., et al., Plaintiffs,**

v.

**CITY OF ATMORE, et al., Defendants.**

**No. CIV. A. 99–0038–CB–C.**

United States District Court,
S.D. Alabama,
Southern Division.

March 27, 2001.

Charles R. Godwin, Timothy J. Godwin, Atmore, AL, for plaintiffs.

Lawrence Wettermark, Thomas O. Gaillard, III, Galloway, Smith, Wettermark & Everest, LLP, Mobile, AL, for defendants.

### ORDER ON MOTION FOR SUMMARY JUDGMENT

BUTLER, Chief Judge.

This matter is before the Court on the defendants' motion for summary judgment. (Doc. 27). The parties have filed briefs and evidentiary materials in support of their respective positions. (Docs.28, 45, 53, 55, 58).[1] Upon consideration of the parties' arguments as expressed in these filings and of all other relevant materials in the file, the Court concludes that the defendants' motion for summary judgment is due to be granted as to the plaintiffs' federal claims and that the plaintiffs' state law claims are due to be dismissed without prejudice.[2]

### BACKGROUND

On the night of July 16, 1998, the plaintiffs' decedent, Raymond Holland Jr., was

---

1. The defendants' motion for extension of time, (Doc. 57), is **moot.**

2. The defendants' request for oral argument, (Doc. 44), construed as a motion for oral argument, is **moot.**

arrested by officers of the Atmore Police Department for driving under the influence and other offenses. Holland was taken to the Atmore city jail, booked, and locked down. Within thirty minutes, Holland was found dead or dying in his cell, having used his shoelaces to hang himself.

The amended complaint names as defendants the City of Atmore (the "City"), police chief Danny McKinley, mayor Rodney Owens, the Atmore City Council, council members Jerry Gehman, John Watkins, Curtis Harris, John Garrard and David McKinley, and jailer/dispatchers Frank Bryars and Valeria Drane. (Doc. 15 at 2–3). All individual defendants are sued in both their official and individual capacities. (*Id.*)

## CAUSES OF ACTION

The four counts of the amended complaint, each asserted against all defendants, are as follows:

- **Count One:** That the defendants were deliberately indifferent to Holland's well-being in violation of the Fifth, Eighth and Fourteenth Amendments, as vindicated pursuant to 42 U.S.C. § 1983;
- **Count Two:** That the defendants conspired to violate Holland's rights under the Fifth, Eighth and Fourteenth Amendments, in violation of 42 U.S.C. §§ 1985(3) and 1986;
- **Count Three:** That the defendants negligently caused Holland's death;
- **Count Four:** That the defendants willfully or wantonly caused Holland's death.

(Doc. 15 at 8–17).

## PLAINTIFFS' STATEMENT OF FACTS

The plaintiffs argue that Holland twice previously attempted suicide and that

agents of the Atmore Police Department were aware of each of them. The evidence, taken almost exclusively from the plaintiffs' filings,[3] is as follows:

On December 6, 1997, Holland consumed alcohol and slit his wrists with a razor blade while at his brother-in-law's house. He inflicted a two-inch laceration, not deep, on his left wrist and a scratch on his right wrist. This incident occurred shortly after Holland came home from working offshore and discovered his wife was having an affair. (Doc. 55, Exhibits 3, 5, 6, 15).

Holland's sister-in-law called 911 and advised the dispatcher that "Raymond Holland, Jr." had slit his wrists while trying to kill himself. Bryars, who knew Holland, worked as 911 dispatcher on December 6, 1997. The dispatcher dispatched an ambulance to the location. In the presence of the paramedics and sheriff's deputies, Holland repeatedly stated that he was not through trying, that the doctor was wasting his time, and that if he did not kill himself now, he would do so later. Holland was taken to a local hospital for treatment and then placed on suicide watch by the sheriff's department. (Doc. 28, Exhibit 9; Doc. 55, Exhibits 3–6).

In February 1998, two police officers acknowledged they were aware of the December 1997 incident. (Doc. 55, Exhibits 5, 13).

On February 5, 1998, Holland was arrested by officers of the Atmore Police Department and charged with driving under the influence. His wife had recently left him to live with her lover. His blood alcohol level was measured at 0.12%. He acted irrationally and belligerently and threatened to hurt himself because of the

---

**3.** The only exceptions are the July 1998 arrest reports and two brief affidavits submitted by the defendants, (Doc. 28, Exhibits 1, 7, 9), which are essentially cumulative of the plaintiffs' own filings.

problems with his wife, stating that she had left him for a black man and that life was not worth living. (Doc. 55, Exhibits 8, 9, 11).

Accordingly, Holland was placed on suicide watch. In his cell, Holland banged his head against the bars and opened a laceration on his forehead. He continued to act very belligerently and said that he did not want to live and that he wanted to die. Paramedics were summoned and he was transported, along with two police officers, to a local hospital, where he continued to insist he wanted to die. The emergency room doctor suspected a possible skull fracture, but hospital records do not reflect a final diagnosis. He ordered continuous observation of Holland, which police officers provided in the hospital overnight. Several police officers were aware of the February 1998 incident, including Holland's conduct at the hospital. (Doc. 55, Exhibits 5, 8, 9, 12–14, 16).

On February 9, 1998, Holland met with a mental health representative and reported that he "has resolved some issues" and "has decided to live." (Doc. 55, Exhibit 15).

At approximately 9:55 p.m. on July 16, 1998, Holland was arrested for driving under the influence, driving with a revoked license, possession of drug paraphernalia (a crack pipe), and possession of a controlled substance (Valium). His blood alcohol level was measured at 0.09% and 0.10%. (Doc. 28, Exhibit 1; Document 55, Exhibit 18).

The arresting officers and other witnesses noted that Holland was calm and cooperative throughout the arrest and booking process, raising his voice only to deny drug use. He inquired several times about making bond so that he could report to work the next day. He acknowledged a drinking problem and spoke about getting help for it. He mentioned to an acquaintance that his mother had a condolence card for the acquaintance, whose mother had recently died. He was sufficiently self-possessed that he was allowed the privilege of smoking a cigarette outside before being placed in a cell. (Doc. 28, Exhibits 7, 9; Doc. 55, Exhibits 7–10).

Holland reported that he was being treated for colon cancer. He declined to make a telephone call, saying he had no one to call. He did not mention his wife. When asked if he was getting along with his wife he said no, but did not become upset. When talking about his children, he came close to tears. (Doc. 55, Exhibits 8, 10).

Overall, Holland was a "different person" than he had been on February 5, 1998. A long-time acquaintance found him in a "good frame of mind" and appearing to be his "regular self." Six law enforcement officers observed Holland at length before he was placed in his cell at 10:50 p.m., including three who had observed him on February 5, 1998, and none detected any sign of a suicidal temperament. Holland did not threaten or mention suicide. (Doc. 28, Exhibits 7, 9; Doc. 55, Exhibits 7–10).

## DETERMINATIONS OF UNCONTROVERTED FACT

At the time of Holland's death, Drane was unaware of any prior suicide attempt or threat by Holland.

At the time of Holland's death, Bryars was unaware of any suicide attempt or threat by Holland in February 1998.

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

■ Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Federal Rule of Civil Procedure 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH–Siegen*, 965 F.2d 994, 999 (11th Cir.1992) (internal citations and quotations omitted).

## I. Section 1983.

■ Because Holland was not a prisoner convicted of any offense but a pretrial detainee following arrest, the Eighth Amendment's prohibition of cruel and unusual punishment is not implicated. *Tittle v. Jefferson County Commission*, 10 F.3d 1535, 1539 n. 3 (11th Cir.1994)(en banc). The plaintiffs' Eighth Amendment claim is therefore due to be dismissed.

■ A pretrial detainee, however, does enjoy rights under the due process clause. *Hamm v. DeKalb County*, 774 F.2d 1567, 1572–74 (11th Cir.1985), *cert. denied*, 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986). As applicable to this case, the due process clause prohibits jailers and guards from being "deliberately indifferent" to a "strong likelihood" that the detainee will commit suicide. *E.g., Heggs v. Grant*, 73 F.3d 317, 320 (11th Cir.1996); *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir.1994). Municipalities, supervisors and others removed from the direct care of a detainee may also be liable for deliberate indifference. *E.g., Tittle v. Jefferson County Commission*, 10 F.3d at 1539–41 (county commission); *Belcher v. City of Foley*, 30 F.3d at 1396–99 (police chief).

### A. Mayor, City Council and Council Members.

■ The defendants point out that these defendants have no connection with the operation of the jail other than with respect to funding. (Doc. 27 at 17). The plaintiffs identify no evidence connecting these defendants with Holland's suicide or with any policy bearing on his suicide. On the contrary, they insist that Chief McKinley "is the city's policy maker for jail management and APD personnel training." (Doc. 53 at 31–32).

The plaintiffs make no effort to identify a legal or factual basis for imposing Section 1983 liability on the mayor, council and councilmen. Accordingly, their Section 1983 claims against these defendants are due to be dismissed.

### B. Bryars and Drane.

The defendants argue that Bryars and Drane, the jailer/dispatchers on duty during Holland's confinement, did not violate Holland's constitutional rights to begin with and that they are in any event enti-

tled to qualified immunity in their individual capacities. (Doc. 27 at 20–27).[4]

 "We hold ... that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). This Eighth Amendment standard requiring subjective knowledge of the facts and subjective appreciation of their import applies as well to pretrial detainees. *See, e.g., Taylor v. Adams,* 221 F.3d 1254, 1258 (11th Cir. 2000), *cert. denied,* 531 U.S. 1077, 121 S.Ct. 774, 148 L.Ed.2d 673 (2001); *Hale v. Tallapoosa County,* 50 F.3d 1579, 1583 (11th Cir.1995). In particular, it applies to jailhouse suicides. *Haney v. City of Cumming,* 69 F.3d 1098, 1102 (11th Cir.1995), *cert. denied,* 517 U.S. 1209, 116 S.Ct. 1826, 134 L.Ed.2d 931 (1996).[5]

 Because *Farmer* requires that the defendant's knowledge of the facts and appreciation of the resulting risk be actual, Eleventh Circuit cases suggesting that merely constructive knowledge is sufficient [6] are no longer good law. While the defendant's mere denial of subjective awareness is not dispositive, the plaintiff must provide sufficient circumstantial evidence, including the obviousness of the facts and of the resulting inference of risk, to support a finding of subjective awareness. *Farmer v. Brennan,* 511 U.S. at 842, 114 S.Ct. 1970.

The "excessive risk" required by *Farmer* has been quantified by the Eleventh Circuit as a *"strong likelihood,* rather than a mere possibility, that suicide would result from a defendant's actions or inaction." *Tittle v. Jefferson County Commission,* 10 F.3d at 1540 (emphasis added, internal quotations omitted); *accord Heggs v. Grant,* 73 F.3d at 320 (the plaintiff must show that the detainee "would *most likely* harm herself" absent precautions) (emphasis added). This "strong likelihood" must be based on facts concerning the deceased, not experience with other detainees in the facility or studies of detainees generally. *E.g., Tittle v. Jefferson County Commission,* 10 F.3d at 1539 ("[A] finding of deliberate indifference requires that officials have notice of the suicidal tendency of *the* individual whose rights are at issue ....")(emphasis in original).

Moreover, only a limited range of facts are sufficient to show the existence of a "strong likelihood" that a particular detainee will commit suicide while in custody. Courts, including the Eleventh Circuit, have rejected the notion that circumstances such as intoxication, sadness, anger, concern or violence reflect a strong likelihood of imminent suicide. *See, e.g., Criswell v. Wayne County,* 1998 WL

---

4. The absence of a constitutional violation is equally fatal to an official capacity suit and to an individual capacity suit. Even if a constitutional violation occurred, government officials acting within their discretionary authority are shielded from individual liability for damages unless their conduct violated clearly established constitutional law.

5. Because *Farmer* was not decided based on an interpretation of the judicially crafted term "deliberate indifference" (which applies to pretrial detainees under the due process clause) but on an analysis of the scope of the term "punishment" under the Eighth Amendment (which does not), 511 U.S. at 838, 840, 114 S.Ct. 1970, it is not clear that *Farmer* requires extrapolation to the pretrial detainee context. Whatever the merits of such an extension, the Eleventh Circuit has taken that step, and this Court is bound to follow it.

6. *See, e.g., Popham v. City of Talladega,* 908 F.2d 1561, 1564 (11th Cir.1990).

598739 at *3 (6th Cir.1998)("A detainee's unhappiness after an arrest is not abnormal and does not alert the jail authorities to a strong likelihood that the detainee will commit suicide."); *Estate of Hocker v. Walsh,* 22 F.3d 995, 1001 (10th Cir.1994)(intoxication does not present a specific risk of suicide); *Barber v. City of Salem,* 953 F.2d 232, 240 (6th Cir. 1992)(while "the decedent did express concern over his job, his employment, and his ability to obtain custody of his young son due to his arrest [,] such a reaction to an arrest for driving under the influence cannot be considered abnormal and would not alert the jail authorities to a strong likelihood that [the decedent] would commit suicide."); *Brewer v. City of Daphne,* 111 F.Supp.2d 1299, 1317 (S.D.Ala.1999)(as a matter of law, intoxication and addiction do not show a strong likelihood that a detainee will commit suicide).

In *Popham v. City of Talladega,* 908 F.2d 1561 (11th Cir.1990), the Court held that, even though the arrestee was known to be "intoxicated, emotional, depressed and angry," the defendants had no knowledge of his suicidal tendencies. *Id.* at 1563, 1564.[7] "Implicit in *Popham* is a holding that simple knowledge that the detainee fits the profile of a high suicide risk is not enough." *Barber v. City of Salem,* 953 F.2d at 239. *See also Williams v. Lee County,* 78 F.3d 491, 493 (11th Cir.1996)(information from a medical facility that the decedent had "homicidal tendencies" provided no reason to assume the detainee carried any likelihood of suicide); *Hardin v. Hayes,* 957 F.2d 845, 850–51 (11th Cir.1992)(decedent's stabbing of herself in the neck with a pen, banging her head against the bars of her cell, flooding her cell with water and excreting on the floor did not show a strong likelihood of suicide).

The only circumstance recognized as providing a sufficiently strong likelihood of an imminent suicide attempt is a prior attempt or threat. "In the absence of a previous threat of or an earlier attempt at suicide, we know of no federal court in the nation or any other court within this circuit that has concluded that official conduct in failing to prevent a suicide constitutes deliberate indifference." *Edwards v. Gilbert,* 867 F.2d 1271, 1275 (11th Cir. 1989). "In light of the fact that the Decedent had not previously attempted suicide, nor made suicide threats, we cannot conclude that there was a strong likelihood of self-inflicted harm." *Hardin v. Hayes,* 957 F.2d at 851.

 It is uncontroverted that Drane did not know that Holland had previously attempted suicide. (Doc. 28, Exhibit 14 at 22–23, 25).[8] The plaintiffs point to a police department standard operating procedure that radio dispatchers "shall report to work ten (10) minutes prior to going on shift to receive information from the off going shift," (Doc. 55, Exhibit 25), and conclude that, "if one assumes [this] procedure w[as] followed on February 5, 1998, then one could easily infer that Drane was apprised of Holland's February 5 suicide attempt at APD." (Doc. 53 at 22). The plaintiffs, however, insist that "that policy was *not* followed and *not* enforced." (*Id.* at 7 (emphasis added)). Moreover, Holland was not a guest of the jail when Drane came on duty on February 5, 1998,

---

7. The district court opinion reflects evidence that the decedent "violently resisted" arrest, had to be forcefully placed into a holding cell, "cursed, kicked and spat at the officers," and "began to cry or whimper." *Popham v. City of Talladega,* 742 F.Supp. 1504, 1505–06 (N.D.Ala.1989).

8. The defendants question whether the December 1997 and February 1998 incidents in fact constituted suicide attempts. The Court's disposition of this matter obviates consideration of this issue.

but had already been transported to a local hospital, and the plaintiffs have offered no evidence to support an inference that a vague directive to "receive information from the off going shift," even if followed, would encompass a report on a suicide attempt by someone no longer in custody on premises, much less the name of the individual.

In short, the plaintiffs have not created a jury issue as to whether Drane was aware of facts reflecting a strong likelihood that Holland would commit suicide on the night of July 16, 1998 or as to whether Drane subjectively realized that such a strong likelihood existed. Indeed, as discussed below, the facts the plaintiffs claim that Drane and Bryars should have known do not reflect a strong likelihood that Holland would kill himself on July 16, 1998 to begin with. For both reasons, the plaintiffs' Section 1983 claim against Drane is due to be dismissed.

█ The plaintiffs have offered no evidence or argument that Bryars was aware of Holland's February 1998 suicide attempt. They have, however, presented evidence that in December 1997 Bryars handled a 911 call advising that Holland had slit his wrists and that Bryars responded by dispatching an ambulance. They have also presented evidence that Bryars knew Holland. This evidence is sufficient to support an inference that, on July 16, 1998, Bryars was aware that Holland had at-tempted suicide some seven months earlier.

█ The plaintiffs have not, however, demonstrated the existence of a jury question as to whether Bryars subjectively appreciated that Holland posed a strong likelihood of committing suicide on the night of July 16, 1998. Bryars denies any such awareness, (Doc. 28, Exhibit 9), and the plaintiffs have not shown that Holland's December 1997 suicide attempt made it so "obvious" that Holland carried a strong likelihood of killing himself on July 16, 1998 as to support an inference of Bryars' subjective awareness. Nor could the plaintiffs do so, for the simple reason that Holland's December 1997—and February 1998—suicide attempts, as a matter of law, raised no strong likelihood that Holland would commit suicide on July 16, 1998.[9]

█ As noted, there can be no jailer liability for a detainee's suicide absent a prior attempt or threat. The flip side of this proposition, of course, is that "[w]here prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide their failure to take steps to protect that inmate from committing suicide can amount to deliberate indifference." *Greason v. Kemp*, 891 F.2d 829, 835 (11th Cir.1990). The plaintiffs assume that *Greason* stands for the proposition that any prior suicide attempt or threat establishes a strong likelihood that a detainee will commit suicide upon being taken into

---

9. The plaintiffs' primary argument, that the failure of Bryars and Drane to take preventative measures amounted to deliberate indifference, places the cart before the horse. Liability does not attach to deliberate indifference in the air, but to deliberate indifference *to* a prescribed set of circumstances. Thus, for example, in the medical treatment context a prison official can be liable only if he or she is deliberately indifferent to a "serious medical condition." *E.g., Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1186– 87 (11th Cir.1994). The official may, with constitutional impunity, be deliberately indifferent to, say, a prisoner's hangnail, because a hangnail does not constitute a serious medical condition. *See id.* at 1187–88. In the jail suicide context, what the defendant must be deliberately indifferent to is a "strong likelihood" that the decedent will attempt to kill himself while in custody. Actual, proven deliberate indifference to anything less than a strong likelihood of suicide does not violate the Constitution.

custody. *Greason,* however, simply states, accurately and unremarkably, that a prior threat or attempt "can"—not "will"—support a claim of deliberate indifference. *Greason* does not support the proposition that any prior threat or attempt, however remote, establishes a perpetually strong likelihood of suicide.

On the contrary, "[c]ase law indicates that a 'strong likelihood' of suicide does not exist ... unless ... the prior threat or attempt was somewhat recent ...." *Greffey v. Alabama Department of Corrections,* 996 F.Supp. 1368, 1382 (N.D.Ala. 1998). Thus, courts have held that suicide attempts or threats far removed from the actual suicide do not reflect a strong likelihood of suicide as of the time of the decedent's death. *See Bahner v. Carmack,* 1997 WL 94705 at **1–2 (8th Cir.1997)(the decedent's diary, containing frequent references to suicide, describing an actual suicide attempt by the decedent and his threat to try again, did not support a strong likelihood that the detainee would commit suicide ten months after the last entry, absent manifestations of suicidal tendencies at the time of his suicide); *Miller v. Montgomery County,* 1997 WL 9956 (6th Cir.1997)(defendants were not deliberately indifferent in the face of a suicide attempt approximately two months earlier); *Lambert v. City of Dumas,* 187 F.3d 931, 938 (8th Cir.1999)(a suicide attempt was insufficient to show a strong likelihood of suicide three years later); *Ellis v. Washington County,* 80 F.Supp.2d 791, 796, 801–02 (E.D.Tenn.1998)(decedent's statement that he had thoughts of hurting himself did not show a strong likelihood he would kill himself three weeks later), *aff'd,* 198 F.3d 225 (6th Cir.1999), *cert. denied,* 529 U.S. 1087, 120 S.Ct. 1720, 146 L.Ed.2d 642 (2000).

No Eleventh Circuit case holds that a remote suicide attempt can establish a strong likelihood of suicide months later.[10] In most of the Eleventh Circuit cases in which suicide attempts or threats existed, this history preceded death by only a few hours or days.[11] Nothing in the language of these or other cases supports the proposition that a strong likelihood of suicide may be based on a more remote history.[12]

---

10. Although the Eleventh Circuit has decided over a dozen custodial suicide cases, most were decided on qualified immunity grounds, often without clear distinction between the "strong likelihood" and "deliberate indifference" elements. Only the rare case has survived summary judgment.

11. *See Williams v. Lee County,* 78 F.3d at 492–93 (suicide threat preceded death by 15–20 minutes); *Dolihite v. Maughon ex rel. Videon,* 74 F.3d 1027, 1038–39, 1042 (11th Cir.1996)(suicide attempt preceded second attempt, resulting in brain damage, by two days), *cert. denied,* 519 U.S. 870, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996); *Heggs v. Grant,* 73 F.3d at 319 (suicide threat preceded death by less than three hours); *Haney v. City of Cumming,* 69 F.3d at 1100 (suicide threat preceded death by a few hours); *Belcher v. City of Foley,* 30 F.3d at 1393–94 (suicide threat preceded death by approximately three hours). *Cf. Popham v. City of Talladega,* 908 F.2d 1561, 1564 (11th Cir.1990)(suggesting that a suicide attempt two days before suicide would have been relevant if known to the defendants).

In *Greason v. Kemp,* 891 F.2d 829 (11th Cir.1990), a suicide attempt preceded death by several weeks, but the decedent was in custody and under psychiatric care throughout and had been taken off his medication by the defendants. *Id.* at 832–33. In *Sanders v. Howze,* 177 F.3d 1245 (11th Cir.1999), the decedent slit a wrist over two months before his death but also engaged in subsequent acts of self-mutilation, and the Court did not address whether a strong likelihood of suicide existed, because the defendants were entitled to qualified immunity in any event. *Id.* at 1247–48, 1250–51.

12. In *Edwards v. Gilbert,* 867 F.2d 1271 (11th Cir.1989), the Court cited several cases from outside the Eleventh Circuit in which a prior suicide attempt was known to the defendants. *Id.* at 1275. The histories in some of these cases preceded death by a few weeks to a few months. *See Cabrales v. County of Los Ange-*

The courts' refusal to ground a strong likelihood of suicide on a remote history of suicide attempts makes sense. An individual that threatens or attempts suicide has unequivocally expressed an immediate desire or intent to end his life, and that desire or intent may readily be assumed to persist only until the passions provoking it have cooled sufficiently for reason and self-love to regain primacy. A strong likelihood of self-annihilation may remain for periods of a few hours or even a few days after a suicide attempt or threat, but the plaintiffs have identified no support for the proposition that an individual may remain on the brink of suicide for months at a time, much less that Holland did so.

On the contrary, the plaintiffs' evidence reflects that Holland attempted suicide in December 1997 in a fit of passion brought on by the discovery of his wife's unfaithfulness and attempted suicide in February 1998 in another fit of passion brought on by her recent abandonment of Holland and their children for her lover. These passions quickly subsided, and within a few days of his second attempt Holland had expressly confirmed his decision to live. (Doc. 55, Exhibit 15).

 Assuming without deciding that the evidence in a particular case may overcome the remoteness of a suicidal history, and assuming further that the plaintiffs' witnesses have provided admissible evidence,[13] none provided testimony sufficient to avoid summary judgment. Walter Van Davis testified only that "persons that are a suicide risk normally stay a suicide risk," (Doc. 54, Davis Dep. at 95), a proposition which, even if true, addresses neither the *degree* of suicide risk at any point in time nor the likelihood that Holland *himself,* as opposed to some hypothetical detainee, would kill himself on July 16, 1998. Again, "[s]imple knowledge that the detainee fits the profile of a high suicide risk is not enough." *Barber v. City of Salem,* 953 F.2d at 239. Similarly, Dr. Downs testified only that a prior suicide attempt is a "risk factor" for suicide, (Doc. 54, Downs Dep. at 101), and Julius Darby opined only that someone aware of Holland's prior suicide attempts should be on notice that Holland posed a "suicide risk." (*Id.*, Darby Dep. at 44). Dr. Riddick testified only that, in his experience, "a number of" suicides were in fact preceded by one or more unsuccessful attempts, without drawing any conclusions therefrom. (*Id.*, Riddick Dep. at 21). Cecil Moses offered no testimony concerning the relationship between remote suicide attempts and later jail suicides. (Doc. 55, Exhibit 28).

*les,* 864 F.2d 1454, 1457 (9th Cir.1988)(18 days), *vacated on other grounds,* 490 U.S. 1087, 109 S.Ct. 2425, 104 L.Ed.2d 982 (1989); *Partridge v. Two Unknown Police Officers,* 751 F.2d 1448, 1454 (5th Cir.1985)(several months)(subsequent history omitted); *Guglielmoni v. Alexander,* 583 F.Supp. 821, 824–25 (D.Conn.1984)(two months). However, the Court did not embrace the concept that a remote suicide history can satisfy the strong likelihood requirement, but cited these cases only for the proposition that all cases in which liability has been found involved a past suicide attempt or threat.

At any rate, each of these cases is distinguishable. For example, in *Cabrales* the attempt and the successful suicide occurred during the same period of confinement and were sandwiched around other violent behavior. 864 F.2d at 1457. In *Partridge,* the Court's original opinion vaguely referencing a previous suicide attempt was withdrawn and replaced by another opinion devoid of such reference. *Partridge v. Two Unknown Police Officers,* 791 F.2d 1182, 1183 & n. 2, 1185 (5th Cir.1986). In *Guglielmoni,* there was a second suicide attempt four days before death, during the same period of confinement. 583 F.Supp. at 825.

13. Given the Court's disposition, the defendants' motions to exclude, (Docs.37, 39), are **moot.**

Nor do the circumstances of this case overcome the remoteness of Holland's suicide history. On February 5, 1998, Holland was observed by several police officers, prior to his suicide attempt, to be very belligerent and irrational, threatening to hurt himself and saying that life was not worth living because his wife had left him for a black male. These same three police officers observed Holland on July 16, 1998 and noted the absence of any such behavior. Far from being belligerent or irrational, Holland was calm, cooperative and solicitous of a police officer's mourning. Far from expressing a desire to end his life, he made plans to return to work and combat his drinking problem. Far from mooning over his estranged wife, he mentioned her only when asked, and even then did not become upset about the situation. In short, even if Holland's February 1998 suicide attempt, despite its remoteness, could have created a strong likelihood that similar behavior would presage another attempt, Holland did not display such behavior on July 16, 1998.

The plaintiffs are left to grasp at straws. True, Holland was again somewhat inebriated, remained separated from his wife, and had begun battling colon cancer. These may well be stressors that can give rise to a suicidal intent, but they are not manifestations of such an intent, as plainly required by binding precedent. The plaintiffs emphasize Holland's near tearfulness when talking about his children, but few human reactions are more ambiguous than tears, which can spring from joy, sorrow or anything between—undoubtedly part of the reason that courts require the unambiguous manifestation of a suicide attempt or threat as a prerequisite to a strong likelihood of suicide.

In summary, the plaintiffs cannot establish that Bryars acted with deliberate in-

difference to a strong likelihood that Holland would kill himself on the night of July 16, 1998 because they have failed to create a jury question as to whether such a strong likelihood existed. Accordingly, the plaintiffs' Section 1983 claim against Bryars is due to be dismissed.[14]

## C. Chief McKinley.

▪ Supervisory liability under Section 1983 can arise in only two classes of cases: (1) "when the supervisor personally participates in the alleged constitutional violation"; or (2) "when there is a causal connection between actions of the supervisory official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir.1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991); *accord Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir.1999). It is uncontroverted that Chief McKinley did not personally participate in the arrest or detention of Holland. Instead, the plaintiffs challenge Chief McKinley's alleged failure to promulgate and/or enforce adequate policies for the identification of suicidal detainees, the exchange of information among employees concerning the suicidal tendencies of detainees, and the handling of suicidal detainees. They also challenge his alleged failure adequately to train employees in these particulars.

▪ An element of the plaintiffs' claim against Chief McKinley is that his "conduct was causally related to the subordinate's constitutional violation." *Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir.1995). As discussed in Part I.B, however, the plaintiffs cannot prove this element because, since they have not established a jury issue as to whether Holland possessed a "strong likelihood" of taking his life on the night of July 16, 1998, Bryars and

---

**14.** Because no triable issue exists as to the existence of a constitutional violation, it is unnecessary to consider the defendants' qualified immunity argument.

Drane had no duty to take any precautions to prevent his suicide.

It may be true that, had Chief McKinley promulgated and enforced better policies and better trained the department's employees regarding them, Bryars and Drane would have possessed all the information concerning Holland that various members of the police department possessed in part. It may also be true that, had Bryars and Drane possessed this information, they would have taken steps sufficient to prevent Holland from committing suicide. If so, Chief McKinley's failures would be a cause of Holland's death, but they would not be a cause of a *constitutional violation* causing Holland's death because, even had Bryars and Drane possessed this information, they would have been under no constitutional duty to take preventative steps.[15]

For lack of an underlying constitutional violation by Bryars or Drane, the plaintiffs' Section 1983 claim against Chief McKinley is due to be dismissed.

### D. City of Atmore.

■■■ The plaintiffs argue that the City is liable due to Chief McKinley's challenged policies and failure to train. "[A]

municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)(emphasis omitted); *accord Oladeinde v. City of Birmingham,* 230 F.3d 1275, 1295 (11th Cir.2000); *Hardin v. Hayes,* 52 F.3d 934, 938 (11th Cir.1995). As with Chief McKinley, the absence of an underlying constitutional violation by Bryars and Drane precludes the imposition of Section 1983 liability on the City. Accordingly, the plaintiffs' Section 1983 claim against the City is due to be dismissed.

### II. Sections 1985(3) and 1986.

The defendants point out that the plaintiffs have no evidence that the defendants, or any of them, entered a conspiracy to deprive Holland of his constitutional rights. (Doc. 27 at 27). The plaintiffs offer no such evidence in response. Accordingly, their Section 1985(3) claim is due to be dismissed.[16]

■■■ "Section 1986 claims are therefore derivative of § 1985 violations.... The text of § 1986 requires the existence of a § 1985 conspiracy.... [W]e agree with the

---

**15.** The Court's ruling might be different if the facts relied on by the plaintiffs showed that Holland had a strong likelihood of committing suicide on the night he died, and if the absence of a constitutional violation by Bryars and Drane were due only to their failure to be aware of facts, known to other members of the department, establishing this strong likelihood. It is far from clear that, when the existence of a constitutional violation by those dealing directly with a detainee depends on their subjective awareness of certain facts, a city or its policymakers may effectively preclude liability by policies promoting employee ignorance. The present case does not require resolution of this issue.

**16.** This claim is suspect on other grounds as well. Most obviously, Section 1985(3) reach-

es only conspiracies motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Failure to plead such a class-based animus is grounds for dismissal. *E.g., GJR Investments, Inc. v. County of Escambia,* 132 F.3d 1359, 1370 n. 11 (11th Cir.1998). The plaintiffs have alleged no such class-based animus; even had they alleged a class of detainees or suicidal detainees, they have made no showing that such a group can and does constitute a "class" within Section 1985(3). It has been only two years since the Eleventh Circuit recognized that *any* class other than racial can satisfy Section 1985(3). *See Lyes v. City of Riviera Beach,* 166 F.3d 1332, 1337–40 (11th Cir.1999)(class of women).

district court that § 1986 requires a violation of § 1985 ...." *Park v. City of Atlanta,* 120 F.3d 1157, 1160 (11th Cir.1997). Accordingly, because the plaintiffs' Section 1985(3) claim fails for want of a conspiracy, their Section 1986 clam is due to be dismissed as well.

### III. State Law Claims.

■ "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In exercising its discretion, the Court is to consider "'concerns of comity, judicial economy, convenience, fairness, and the like.'" *Crosby v. Paulk,* 187 F.3d 1339, 1352 (11th Cir.1999)(quoting *Roche v. John Hancock Mutual Life Insurance Co.,* 81 F.3d 249, 257 (1st Cir.1996)); *see also Baggett v. First National Bank,* 117 F.3d 1342, 1352 (11th Cir.1997).

However, "'if the federal claims are dismissed prior to trial, [*United Mine Workers v.*] *Gibbs,* [383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)] strongly encourages or even requires dismissal of state claims.'" *Mergens v. Dreyfoos,* 166 F.3d 1114, 1119 (11th Cir.)(quoting *L.A. Draper & Son v. Wheelabrator–Frye, Inc.,* 735 F.2d 414, 428 (11th Cir.1984))(applying *L.A. Draper* to Section 1367(c)(3)), *cert. denied,* 528 U.S. 820, 120 S.Ct. 63, 145 L.Ed.2d 55 (1999); *see also Baggett v. First National Bank,* 117 F.3d at 1353 (because "[s]tate courts, not federal courts, should be the final arbiters of state law," dismissal of state law claims is strongly encouraged when federal claims are dismissed prior to trial); *Graham v. State Farm Mutual Insurance Co.,* 193 F.3d 1274, 1282 (11th Cir.1999)("If no federal claim survives summary judgment, the court sees no reason why the other claims should not be dismissed or remanded pursuant to 28 U.S.C. § 1367(c)(3)."). Any such dismissal should be without prejudice "so that the claims may be refiled in the appropriate state court." *Crosby v. Paulk,* 187 F.3d at 1352; *see also* 28 U.S.C. § 1367(d).

■ Because all federal claims have been dismissed prior to trial, because state court should be the final arbiter of the plaintiffs' tort claims, and because no countervailing considerations outweigh these circumstances, the plaintiffs' state law claims under Counts Three and Four will be dismissed without prejudice.

### CONCLUSION

The alleged actions and inactions of the defendants and others in connection with Holland's death and the operation of the Atmore city jail are less than exemplary. They may even amount to negligence, a question as to which this Court has and expresses no opinion. The United States Constitution, however, is not a fountainhead of tort law, in which every wrong has a remedy, but a purposefully limited restraint on the worst excesses of government action. The requirements of liability for violation of a pretrial detainee's constitutional due process rights are stringent, and in this case the plaintiffs cannot satisfy them. Accordingly, the defendants' motion for summary judgment is **granted** as to all federal claims against them. The plaintiffs' state law claims are **dismissed without prejudice.** Judgment shall be entered accordingly by separate order.