Laquinta Sharnae BOWENS,
etc., et al., Plaintiffs,

v.

CITY OF ATMORE, et al., Defendants.

No. Civ.A. 99–0593–CB–L.

United States District Court,
S.D. Alabama,
Southern Division.

March 27, 2001.

Charles R. Godwin, Timothy J. Godwin, Atmore, AL, for plaintiffs.

Lawrence M. Wettermark, Thomas O. Gaillard, III, Galloway, Smith, Wettermark & Everest, LLP, for defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

BUTLER, Chief Judge.

This matter is before the Court on the defendants' motion for summary judgment. (Doc. 37). The parties have filed briefs and evidentiary materials in support of their respective positions. (Docs.38, 57–59, 63–64).[1] Upon consideration of the parties' arguments as expressed in these filings and of all other relevant materials in the file, the Court concludes that the defendants' motion for summary judgment is due to be granted as to the plaintiffs' federal claims and that the plaintiffs' state law claims are due to be dismissed without prejudice.[2]

---

1. The plaintiffs' motion to exceed page limitation, (Doc. 50), is **granted.**

2. The defendants' request for oral argument, (Doc. 49), construed as a motion for oral argument, is **moot.**

## BACKGROUND

On the afternoon of May 24, 1999, the plaintiffs' decedent, Marilyn Bowens, was convicted in Atmore municipal court of several misdemeanors associated with her April 3, 1999 arrest. She was sentenced to 120 days in city jail and began serving her sentence immediately. Approximately 24 hours later, she committed suicide in her cell, using her shoelaces to hang herself.

The amended complaint names as defendants the City of Atmore (the "City"), police chief Danny McKinley, mayor Rodney Owens, the Atmore City Council, council members Jerry Gehman, John Watkins, Curtis Harris, John Garrard and David McKinley, and jailer/dispatcher Frank Bryars. (Doc. 4 at 2–3). All individual defendants are sued in both their official and individual capacities. (*Id.*)

## CAUSES OF ACTION

The four counts of the amended complaint, each asserted against all defendants, are as follows:

- **Count One:** That the defendants were deliberately indifferent to Bowens' well-being in violation of the Fifth, Eighth and Fourteenth Amendments, as vindicated pursuant to 42 U.S.C. § 1983;

- **Count Two:** That the defendants conspired to violate Bowens' rights under the Fifth, Eighth and Fourteenth Amendments, in violation of 42 U.S.C. §§ 1985(3) and 1986;

- **Count Three:** That the defendants negligently caused Bowens' death;

- **Count Four:** That the defendants willfully or wantonly caused Bowens' death.

(Doc. 4 at 7–15).

## PLAINTIFFS' STATEMENT OF FACTS

The plaintiffs argue that Bowens attempted suicide while detained in the Atmore city jail on April 3, 1999. They also argue that Bowens had mental and physical problems of which various agents of the Atmore Police Department were aware. The record evidence, viewed most favorably to the plaintiffs, is as follows:

Bowens was born in 1969, the third of nine children. She reached seventh grade in special education classes before being expelled for fighting. She has been diagnosed with borderline intellectual functioning. She remained unemployed, except for two weeks in a fast food establishment, until her death. (Doc. 58, Exhibit 8).[3]

Bowens was raped at age 16. A suspect was arrested but then released. She bore a son in approximately 1991 and a daughter in approximately August 1996, after being diagnosed as HIV positive. By February 1997, she had lost custody of her children to a sister. (Doc. 58, Exhibit 8; Bynum Deposition at 39, 42).

Bowens began using cocaine (often, crack) and alcohol at age 16. She was charged with public intoxication in November 1995, but apparently has no other criminal history concerning drugs or alcohol. (Doc. 38, Exhibit 13; Doc. 58, Exhibit 9; Flavors Deposition at 48).

Bowens attempted to commit suicide in 1994 by overdosing on pills. Bowens later

---

**3.** Both plaintiffs and defendants have submitted voluminous exhibits encompassing records from different sources and different time periods, without Bates stamping them or otherwise providing satisfactory means of identifying individual documents. This poor practice has hampered the Court's ability to readily locate, and to precisely identify in this opinion, the documents to which it refers.

reported she was coming off a cocaine high and was depressed over her mother's recent death. (Doc. 58, Exhibit 8).

In January 1995, Bowens was brought by ambulance to Greenlawn Hospital, where her grandmother reported a chief complaint of "combative[ness]." She was admitted with cocaine withdrawal. While an inpatient, she had her first contact with a Southwest Alabama Mental Health Center representative, to whom she acknowledged audio/visual hallucinations. (Doc. 58, Exhibit 8).

In May 1995, Bowens was admitted to Atmore Hospital with cocaine withdrawal and suicidal ideation. She began settling down after several hours. A history of several prior admissions for the same thing is noted. (Doc. 58, Exhibit 8).

In September 1995, Bowens was arrested and charged with assault for striking her common-law husband in the head with a piece of wood. In November 1995, she was arrested and charged with assault and public intoxication after entering a neighbor's house uninvited. She was released on bond but picked up on an alias warrant in February 1996 after failing to make a court appearance. Bowens spent time in the Atmore city jail on each of these occasions but did not attempt suicide, threaten suicide or exhibit any suicidal behavior. (Doc. 38, Exhibit 1 at 4; Doc. 58, Exhibit 9).

On the final weekend of August 1996, shortly after her daughter was born, Bowens went on a crack and beer binge. Shortly thereafter, she· became belligerent and attacked her uncle without provocation. She also heard voices telling her to kill herself, but she did not try anything. (Doc. 58, Exhibit 8).

As a consequence of this episode, Bowens was admitted to Searcy on September 10, 1996 under a restraining order later amended to an involuntary commitment for treatment and evaluation. She was discharged October 11, 1996 with diagnoses, inter alia, of psychotic disorder not otherwise specified, depressive disorder not otherwise specified, and polysubstance abuse (cocaine, pot and alcohol). She was placed on Haldol and Zoloft. Bowens did not remain compliant with her medications. (Doc. 58, Exhibit 8).

On October 19, 1996, Bowens was transported by ambulance to Atmore Community Hospital upon being found unconscious after a long night of drinking and possible substance abuse. The emergency room physician found her combative and ordered four-point restraints. She was released several hours after arrival. (Doc. 58, Exhibit 8).

On November 3, 1996, Bowens was admitted to Atmore Community Hospital. She was having seizures prior to admission, after using crack. (Doc. 58, Exhibit 8).

Sometime in 1997, Bowens reported that she has considered suicide several times, after using crack and when learning she was HIV positive. (Doc. 58, Exhibit 8).

In February 1997, Bowens was admitted to The Pines at Vaughan on complaint of suicidal thoughts. She had been on an extended crack/cocaine and alcohol binge and had begun hearing voices and feeling suicidal. Bowens reported this is a pattern. With her substance use cut off, Bowens quickly improved. On discharge she was diagnosed, inter alia, with cocaine-induced psychiatric disorder with hallucinations, with onset while intoxicated. (Doc. 58, Exhibit 8).[4]

---

4. Between February 1997 and April 1999, there is no record evidence of any mental health or substance abuse treatment or coun- seling other than a two-hour service with the Southwest Alabama Mental Health Center in June 1998. (Doc. 58, Exhibit 8).

In September 1998, Bowens was hit in the head by her boyfriend and was found lying beside the road, bleeding profusely. As or after police officers and paramedics responded, Bowens experienced a seizure. Bowens was taken to Atmore Community Hospital. (Doc. 58, Exhibit 9).

In conjunction with her seizures, Bowens would foam at the mouth and would sometimes say that she heard voices telling her to kill herself. Prior to her death in 1994, Bowens' mother called the Atmore Police Department several times to report that Bowens was having seizures and/or was hearing voices telling her to kill herself. Each time the police came, and sometimes an ambulance took Bowens to a hospital. Bowens' sister and boyfriend made similar calls after Bowens' mother died. The most recent call referencing auditory hallucinations occurred in approximately early 1999 and was placed by Bowens' father. (West Deposition at 12–18; L. Bowens Deposition at 56–61; A. Bowens, Jr. Deposition at 19–26, 28–30; Bynum Deposition at 46–47).

On April 3, 1999, Officer Brantley responded to a call that Bowens had shoplifted steaks from a grocery store. Brantley located Bowens nearby. She appeared disoriented and began to run as Brantley approached. She struck Brantley repeatedly in the face and otherwise resisted arrest. After being tackled and handcuffed, she had to be dragged or carried to the patrol car by Brantley and Sergeant Hazley. She was foaming at the mouth. At the station, Bowens again had to be carried. In the booking area, where she sprawled out on the floor and kicked over a garbage can, she refused to provide information for the police report. She had to be restrained in order to remove the handcuffs and to place her in a cell. These

events occurred between 10:00 and 10:30 a.m. (Doc. 38, Exhibit 13; Doc. 58, Exhibit 11; Brantley Deposition at 66–67; Hazley Deposition at 69).

Within approximately 30 minutes after being locked down, Bowens had calmed down and become mild mannered. She repeatedly apologized to Officer Brantley for her previous conduct and told him that she was hungry for crack. (Brantley Deposition at 72–76, 78–79, 96).

Later, Bowens began tearing up her mattress and pulling out the rope piping from around its edge. Two of Bowens' sisters arrived and found Bowens sitting on the bunk with a length of fabric or plastic from the mattress around her neck, knotted but not tight enough to choke. Her lunch was strewn over the floor. Bowens was foaming at the mouth, making inarticulate, animal-like noises, experiencing a seizure. Sergeant Hazley was summoned at 12:44 p.m., and he arrived at 12:56 p.m. When Hazley entered to retrieve the mattress, Bowens charged at him so that he had to use the other mattress to protect himself. In the process, Hazley discovered a crack pipe in Bowens' cell. Bowens stated once or twice that if she was kept in the cell, she would kill herself. Bowens appeared to Hazley to be high on something, possibly crack. (Doc. 57 at 9; Doc. 58, Exhibit 11; West Deposition at 32–39; L. Bowens Deposition at 23–24, 32–37; Hazley Deposition at 59, 63, 66, 69).[5]

Bowens was released from jail pending an April 26 court appearance. On April 10, 1999, Bowens' live-in boyfriend of over three years, Gerald Bynum, reported to police that, during a domestic dispute, Bowens had struck him in the head with a lamp. No charges were pressed. (Doc.

---

**5.** Hazley told investigators that Bowens banged the back of her head against the cell wall. (Doc. 58, Exhibit 6). In deposition, however, he acknowledged that he did not see her do so. (Hazley Deposition at 59, 69).

58, Exhibit 9; Brantley Deposition at 79–80; Bynum Deposition at 5).

Bowens had a seizure on the weekend preceding her court date and was so violent that she broke the straps used by the transporting paramedics. Because of her hospitalization, Bowens' court date was reset for May 24, 1999. (Doc. 38, Exhibit 13; Doc. 58, Exhibits 8, 9; Bynum Deposition at 30–31, 47–48).

On Friday, May 21, 1999, Bowens packed all her clothes in Bynum's trailer. That evening, she told Bynum she was leaving and that "I'll never walk this dirt road again." She told a neighbor, "Mary, I won't go to jail.... I'll already be gone." Then she walked down the dirt road leading from the trailer park, alone. Bynum assumed she was leaving him for another man. (Bynum Deposition at 32–35).

Court convened at 2:30 p.m. on Monday, May 24, 1999. Bowens was convicted and sentenced to 120 days in jail. Brantley escorted Bowens to the police department. During the walk, Bowens was laughing, joking, smiling and apologizing to Brantley. She explained that on April 3 she had been coming off a high and wanted to get more cocaine. Prior to locking Bowens down, Brantley emptied her pockets. As Brantley left, Bowens told him she was going to take a nap and do her time. She gave no indication of being under the influence of crack cocaine. Later that day, she asked Sergeant Flavors to find out her sentence. When he advised her, she did not seem upset. (Doc. 38, Exhibits 2, 4; Brantley Deposition at 57, 82–86, 96).

Bowens called Bynum from jail on May 24. She was laughing and joking, talking pretty good. Bynum had told Bowens she would have to pay a fine or do time, and she told him he was right. Bynum told Bowens he would come see her that night or the next day, and she said okay. (Bynum Deposition at 31, 36, 40).

On May 25, 1999, Betty Jean Cox worked as jailer/dispatcher from 7:00 a.m. to 3:00 p.m. She observed Bowens throughout the day on her monitor and by physical inspection and detected no manifestations of suicidal, depressed, or withdrawn behavior. Cox brought Bowens her lunch, and Bowens smiled. (Doc. 38, Exhibits 6, 13; Cox Deposition at 19–20, 23–24).

Sergeant Flavors worked the 5:00 a.m. to 5:00 p.m. shift on May 25, 1999. He had known Bowens for years, and she repeatedly called him to her cell for brief conversations, during which she behaved pleasantly and without signs of depression. (Doc. 38, Exhibits 4, 13; Flavors Deposition at 40).

On the afternoon of May 25, 1999, Bowens was visited by her father, Alford Bowens, Sr. She did not appear disturbed or upset but rather normal and satisfied, and she expressly confirmed she was alright. Mr. Bowens told his daughter they were going to keep her here forever. She smiled and replied, "I know I won't," which he understood to mean she realized he would help her obtain an early release. The two talked of how to get her out, and Bowens asked her father to request a family friend to sign her bond. After speaking approximately 20 to 25 minutes with his daughter, Mr. Bowens left, laughing with police officers that Bowens, since she had air conditioning, was better off than he was. Bowens committed suicide within two hours after her father's departure. (Doc. 38, Exhibit 13; A. Bowens, Sr. Deposition at 18–20, 22–25, 28).

Bryars came on duty as jailer/dispatcher at approximately 3:00 p.m., 68 minutes before Bowens' suicide was discovered. (Doc. 38, Exhibit 13; Doc. 58, Exhibit 13).

Bowens' last conversation with Flavors, less than an hour before her death, was to request a telephone call, to which Flavors

agreed. When Flavors returned, Bowens had hanged herself. (Doc. 38, Exhibit 4 at 2; Flavors Deposition at 40–41, 43).

Six witnesses who observed or spoke with Bowens on May 24 and/or 25, 1999, including her father, her live-in boyfriend of over three years, and a long-time friend, have testified that she showed no signs of being suicidal. (Doc. 38, Exhibit 4 at 3; *id.* Exhibit 5 at 3; *id.* Exhibit 6; *id.* Exhibit 13; Brantley Deposition at 57, 85; A. Bowens, Sr. Deposition at 27–28; Bynum Deposition at 37–38, 41–42).

Much of the foregoing information concerning Bowens was unknown to Bryars at the time of Bowens' death. The record contains evidence that Bryars was aware of rumors that Bowens used alcohol, was a drug addict and was HIV positive. There is also evidence that, in early 1999, Bryars was among those responding to a call placed by Bowens' father reporting that Bowens was having a seizure and hearing voices telling her to kill herself. (Doc. 38, Exhibit 5; Bryars Deposition at 22, 25–26, 31–32; A. Bowens, Jr. Deposition at 23, 28–30). While Bryars denies awareness of Bowens' conduct on April 3, 1999, the plaintiffs note that he worked the afternoon shift and contend that under standard operating procedures he should have been advised of events occurring on the preceding shift. (Doc. 57 at 21; Doc. 58, Exhibits 3, 4; Bryars Deposition at 26).[6]

The record evidence concerning the awareness of Bowens' history by other city police officers is more extensive. The events of April 3, 1999 and of May 24 and 25, 1999 were obviously known to various police officers.[7] Similarly, Bynum's April 10, 1999 complaint concerning Bowens, and Bowens' prior arrests, were necessarily known to various police officers. Bowens' HIV positive status, and her abuse of alcohol and cocaine, were widely understood if not confirmed as fact. (Doc. 38, Exhibit 1 at 4; *id.* Exhibit 2 at 3; *id.* Exhibit 3 at 3; *id.* Exhibit 4 at 3; Doc. 58, Exhibit 2; McKinley Deposition at 21–22, 48; Brantley Deposition at 78; Hazley Deposition at 71; Flavors Deposition at 10–11, 48). There is also evidence that police officers were aware that Bowens had experienced seizures and heard voices telling her to kill herself. (West Deposition at 12–18; L. Bowens Deposition at 56–61; A. Bowens, Jr. Deposition at 19–26, 28–30; Bynum Deposition at 46–47). Finally, there is evidence that officers were aware of Bowens' 1994 suicide attempt. (Hazley Deposition at 70).[8]

Metabolites of cocaine were present in Bowens' bloodstream upon autopsy. These were the residue of cocaine ingested between 12 and 36 hours before death, with 24 hours before death being the single most likely time of ingestion. (Doc. 58, Exhibit 7; Riddick Deposition at 37–38; Barnhill Deposition at 28–29).

---

**6.** Although the plaintiffs simultaneously assert that this procedure was *not* followed, (Doc. 57 at 41), the Court will assume for present purposes that a jury issue is presented as to Bryars' awareness of Bowens' conduct on April 3, 1999.

**7.** Although Sergeant Hazley apparently denies seeing a length of fabric or plastic around Bowens' neck, the testimony of Bowens' sisters that they observed this in Hazley's presence creates a fact issue. (Doc. 58, Exhibit 10; Hazley Deposition at 62; West Deposition at 36–37; L. Bowers Deposition at 33).

**8.** Sergeant Hazley's affidavit asserts he was aware, on April 3, 1999, of Bowens' "reputation for suicide attempts and suicide threats." (Doc. 58, Exhibit 10 at 1). In deposition, however, he acknowledged he has no personal knowledge of prior suicide tendencies or attempts by Bowens and that he was relying on information from other officers that Bowens had made one prior suicide attempt and on a statement by Sergeant Flavors that Bowens was suicidal. (Hazley Deposition at 70).

## DETERMINATIONS OF UNCONTROVERTED FACT

Before her death, Bowens did not attempt or threaten suicide while in custody on May 24 and 25, 1999.

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

■ Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Federal Rule of Civil Procedure 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 999 (11th Cir.1992) (internal citations and quotations omitted).

## I. Section 1983.

■ Because Bowens was a prisoner convicted of an offense, the Eighth Amendment's prohibition of cruel and unusual punishment is implicated. *Tittle v. Jefferson County Commission,* 10 F.3d 1535, 1539 n. 3 (11th Cir.1994)(en banc). Whether or not a prisoner may also state a claim under the due process clause is immaterial, because the analysis is the same. *Id.* at 1539. As applicable to this case, the Eighth Amendment prohibits jailers and guards from being "deliberately indifferent" to a "strong likelihood" that the prisoner will commit suicide. *E.g., id.* at 1540. Municipalities, supervisors and others removed from the direct care of a detainee may also be liable for deliberate indifference. *E.g., id.* at 1539–41 (county commission); *Belcher v. City of Foley,* 30 F.3d at 1396–99 (police chief).

### A. Mayor, City Council and Council Members.

■ The defendants point out that these defendants have no connection with the operation of the jail other than with respect to funding. (Doc. 37 at 34, 37). The plaintiffs identify no evidence connecting these defendants with Bowen's suicide or with any policy bearing on her suicide. On the contrary, they insist that Chief McKinley "is the city's policy maker for jail management and APD personnel training." (Doc. 57 at 40).

The plaintiffs make no effort to identify a legal or factual basis for imposing Section 1983 liability on the mayor, council and councilmen. Accordingly, their Section 1983 claims against these defendants are due to be dismissed.

### B. Bryars.

The defendants argue that Bryars, the jailer/dispatcher on duty at the time of Bowens' suicide, did not violate Bowens'

constitutional rights to begin with and that he is in any event entitled to qualified immunity in his individual capacity. (Doc. 37 at 14–35).[9]

■ "We hold ... that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). This Eighth Amendment standard requiring subjective knowledge of the facts and subjective appreciation of their import applies to jailhouse suicides. *Haney v. City of Cumming,* 69 F.3d 1098, 1102 (11th Cir.1995), *cert. denied,* 517 U.S. 1209, 116 S.Ct. 1826, 134 L.Ed.2d 931 (1996).

■ Because *Farmer* requires that the defendant's knowledge of the facts and appreciation of the resulting risk be actual, Eleventh Circuit cases suggesting that merely constructive knowledge is sufficient[10] are no longer good law. While the defendant's mere denial of subjective awareness is not dispositive, the plaintiff must provide sufficient circumstantial evidence, including the obviousness of the facts and of the resulting inference of risk, to support a finding of subjective awareness and appreciation. *Farmer v. Brennan,* 511 U.S. at 842, 114 S.Ct. 1970.

The "excessive risk" required by *Farmer* has been quantified by the Eleventh Circuit as a *"strong likelihood,* rather than a mere possibility, that suicide would re-sult from a defendant's actions or inaction." *Tittle v. Jefferson County Commission,* 10 F.3d at 1540 (emphasis added, internal quotations omitted); *accord Heggs v. Grant,* 73 F.3d at 320 (the plaintiff must show that the detainee "would *most likely* harm herself" absent precautions) (emphasis added). This "strong likelihood" must be based on facts concerning the deceased, not experience with other detainees in the facility or studies of detainees generally. *E.g., Tittle v. Jefferson County Commission,* 10 F.3d at 1539 ("[A] finding of deliberate indifference requires that officials have notice of the suicidal tendency of *the* individual whose rights are at issue ....")(emphasis in original).

Moreover, only a limited range of facts are sufficient to show the existence of a "strong likelihood" that a particular detainee will commit suicide while in custody. Courts, including the Eleventh Circuit, have rejected the notion that circumstances such as intoxication, sadness, anger, concern or violence reflect a strong likelihood of imminent suicide. *See, e.g., Criswell v. Wayne County,* 1998 WL 598739 at *3 (6th Cir.1998)("A detainee's unhappiness after an arrest is not abnormal and does not alert the jail authorities to a strong likelihood that the detainee will commit suicide."); *Estate of Hocker v. Walsh,* 22 F.3d 995, 1001 (10th Cir.1994)(intoxication does not present a specific risk of suicide); *Barber v. City of Salem,* 953 F.2d 232, 240 (6th Cir. 1992)(while "the decedent did express concern over his job, his employment, and his ability to obtain custody of his young son due to his arrest [,] such a reaction to an arrest for driving under the influence cannot be considered abnormal and would not

---

**9.** The absence of a constitutional violation is equally fatal to an official capacity suit and to an individual capacity suit. Even if a constitutional violation occurred, government officials acting within their discretionary authority are shielded from individual liability for

damages unless their conduct violated clearly established constitutional law.

**10.** *See, e.g., Popham v. City of Talladega,* 908 F.2d 1561, 1564 (11th Cir.1990).

alert the jail authorities to a strong likelihood that [the decedent] would commit suicide."); *Brewer v. City of Daphne,* 111 F.Supp.2d 1299, 1317 (S.D.Ala.1999)(as a matter of law, intoxication and addiction do not show a strong likelihood that a detainee will commit suicide).

In *Popham v. City of Talladega,* 908 F.2d 1561 (11th Cir.1990), the Court held that, even though the arrestee was known to be "intoxicated, emotional, depressed and angry," the defendants had no knowledge of his suicidal tendencies. *Id.* at 1563, 1564.[11] "Implicit in *Popham* is a holding that simple knowledge that the detainee fits the profile of a high suicide risk is not enough." *Barber v. City of Salem,* 953 F.2d at 239. *See also Williams v. Lee County,* 78 F.3d 491, 493 (11th Cir.1996)(information from a medical facility that the decedent had "homicidal tendencies" provided no reason to assume the detainee carried any likelihood of suicide); *Hardin v. Hayes,* 957 F.2d 845, 850–51 (11th Cir.1992)(decedent's stabbing of herself in the neck with a pen, banging her head against the bars of her cell, flooding her cell with water and excreting on the floor did not show a strong likelihood of suicide).

The only circumstance recognized as providing a sufficiently strong likelihood of an imminent suicide attempt is a prior attempt or threat. "In the absence of a previous threat of or an earlier attempt at suicide, we know of no federal court in the nation or any other court within this circuit that has concluded that official conduct in failing to prevent a suicide consti-

tutes deliberate indifference." *Edwards v. Gilbert,* 867 F.2d 1271, 1275 (11th Cir. 1989). "In light of the fact that the Decedent had not previously attempted suicide, nor made suicide threats, we cannot conclude that there was a strong likelihood of self-inflicted harm." *Hardin v. Hayes,* 957 F.2d at 851.

As noted, the plaintiffs have presented evidence that, on May 25, 1999, Bryars was aware of Bowens' disruptive behavior on April 3, 1999 and of her suicide attempt while in jail.[12] They have also presented evidence that Bryars knew or understood that Bowens used alcohol, was a drug addict, was HIV positive, and had experienced a seizure and heard voices telling her to kill herself.

The plaintiffs have not, however, demonstrated the existence of a jury question as to whether Bryars subjectively appreciated that Bowens posed a strong likelihood of committing suicide on the afternoon of May 25, 1999. Bryars denies any such awareness, (Doc. 38, Exhibit 5 at 3–4), and the plaintiffs have not shown that either Bowens' April 3, 1999 suicide attempt or her physical and mental problems of which he was aware made it so "obvious" that Bowens carried a strong likelihood of killing herself on May 25, 1999 as to support an inference of Bryars' subjective appreciation. Nor could the plaintiffs do so, for the simple reason that the facts known to Bryars—indeed, all the facts on which the plaintiffs rely, including those unknown to Bryars—as a matter of law raised no strong likelihood that Bowens would commit suicide on May 25, 1999.[13]

---

11. The district court opinion reflects evidence that the decedent "violently resisted" arrest, had to be forcefully placed into a holding cell, "cursed, kicked and spat at the officers," and "began to cry or whimper." *Popham v. City of Talladega,* 742 F.Supp. 1504, 1505–06 (N.D.Ala.1989).

12. The defendants question whether Bowens actually attempted suicide on April 3, 1999. The Court's disposition of this matter obviates consideration of this issue.

13. The plaintiffs' primary argument, that the failure of Bryars to take preventative measures amounted to deliberate indifference, places the cart before the horse. Liability

■ As noted, there can be no jailer liability for a detainee's suicide absent a prior attempt or threat. The flip side of this proposition, of course, is that "[w]here prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide their failure to take steps to protect that inmate from committing suicide can amount to deliberate indifference." *Greason v. Kemp*, 891 F.2d 829, 835 (11th Cir.1990). The plaintiffs assume that *Greason* stands for the proposition that any prior suicide attempt or threat establishes a strong likelihood that a detainee will commit suicide upon being taken into custody. *Greason*, however, simply states, accurately and unremarkably, that a prior threat or attempt "can"—not "will"—support a claim of deliberate indifference. *Greason* does not support the proposition that any prior threat or attempt, however remote, establishes a perpetually strong likelihood of suicide.

On the contrary, "[c]ase law indicates that a 'strong likelihood' of suicide does not exist ... unless ... the prior threat or attempt was somewhat recent...." *Greffey v. Alabama Department of Corrections*, 996 F.Supp. 1368, 1382 (N.D.Ala. 1998). Thus, courts have held that suicide attempts or threats far removed from the actual suicide do not reflect a strong likelihood of suicide as of the time of the decedent's death. *See Bahner v. Carmack*, 1997 WL 94705 at 1–2 (8th Cir.1997)(the decedent's diary, containing frequent references to suicide, describing an actual suicide attempt by the decedent and his threat to try again, did not support a strong likelihood that the detainee would commit suicide ten months after the last entry, absent manifestations of suicidal tendencies at the time of his suicide); *Miller v. Montgomery County*, 1997 WL 9956 (6th Cir.1997)(defendants were not deliberately indifferent in the face of a suicide attempt approximately two months earlier); *Lambert v. City of Dumas*, 187 F.3d 931, 938 (8th Cir.1999)(a suicide attempt was insufficient to show a strong likelihood of suicide three years later); *Ellis v. Washington County*, 80 F.Supp.2d 791, 796, 801–02 (E.D.Tenn.1998)(decedent's statement that he had thoughts of hurting himself did not show a strong likelihood he would kill himself three weeks later), *aff'd*, 198 F.3d 225 (6th Cir.1999), *cert. denied*, 529 U.S. 1087, 120 S.Ct. 1720, 146 L.Ed.2d 642 (2000).

No Eleventh Circuit case holds that a remote suicide attempt can establish a strong likelihood of suicide months later.[14] In most of the Eleventh Circuit cases in which suicide attempts or threats existed, this history preceded death by only a few hours or days.[15] Nothing in the language of these or other cases supports the propo-

does not attach to deliberate indifference in the air, but to deliberate indifference *to* a prescribed set of circumstances. Thus, for example, in the medical treatment context a prison official can be liable only if he or she is deliberately indifferent to a "serious medical condition." *E.g., Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1186–87 (11th Cir.1994). The official may, with constitutional impunity, be deliberately indifferent to, say, a prisoner's hangnail, because a hangnail does not constitute a serious medical condition. *See id.* at 1187–88. In the jail suicide context, what the defendant must be deliberately indifferent to is a "strong likelihood" that the decedent will attempt to kill himself while in custody. Actual, proven deliberate indifference to anything less than a strong likelihood of suicide does not violate the Constitution.

**14.** Although the Eleventh Circuit has decided over a dozen custodial suicide cases, most were decided on qualified immunity grounds, often without clear distinction between the "strong likelihood" and "deliberate indifference" elements. Only the rare case has survived summary judgment.

**15.** *See Williams v. Lee County*, 78 F.3d at 492–93 (suicide threat preceded death by 15–20 minutes); *Dolihite v. Maughon ex rel. Videon*, 74 F.3d 1027, 1038–39, 1042 (11th Cir.)(suicide attempt preceded second attempt, result-

sition that a strong likelihood of suicide may be based on a more remote history.[16]

The courts' refusal to ground a strong likelihood of suicide on a remote history of suicide attempts makes sense. An individual that threatens or attempts suicide has unequivocally expressed an immediate desire or intent to end his life, and that desire or intent may readily be assumed to persist until, but only until, the passions provoking it have cooled sufficiently for reason and self-love to regain primacy. A strong likelihood of self-annihilation may remain for periods of a few hours or even a few days after a suicide attempt or threat, but the plaintiffs have identified no support for the proposition that an individ-

ual may remain on the brink of suicide for months at a time, much less that Bowens did so.

On the contrary, the plaintiffs' evidence reflects that Bowens attempted suicide on April 3, 1999 in a fit of irrationality brought on by cocaine withdrawal. Within a few hours, Bowens had returned to her right mind and was calm, mild mannered and apologetic.

■■■ Assuming without deciding that the evidence in a particular case may overcome the remoteness of a suicidal history, and assuming further that the plaintiffs' witnesses have provided admissible evidence,[17] none provided testimony sufficient

---

ing in brain damage, by two days), *cert. denied,* 519 U.S. 870, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996); *Heggs v. Grant,* 73 F.3d at 319 (suicide threat preceded death by less than three hours); *Haney v. City of Cumming,* 69 F.3d at 1100 (suicide threat preceded death by a few hours); *Belcher v. City of Foley,* 30 F.3d at 1393–94 (suicide threat preceded death by approximately three hours). *Cf. Popham v. City of Talladega,* 908 F.2d 1561, 1564 (11th Cir.1990)(suggesting that a suicide attempt two days before suicide would have been relevant if known to the defendants).

In *Greason v. Kemp,* 891 F.2d 829 (11th Cir.1990), a suicide attempt preceded death by several weeks, but the decedent was in custody and under psychiatric care throughout and had been taken off his medication by the defendants. *Id.* at 832–33. In *Sanders v. Howze,* 177 F.3d 1245 (11th Cir.1999), the decedent slit a wrist over two months before his death but also engaged in subsequent acts of self-mutilation, all during a single period of confinement, and the Court did not address whether a strong likelihood of suicide existed, because the defendants were entitled to qualified immunity in any event. *Id.* at 1247–48, 1250–51.

**16.** In *Edwards v. Gilbert,* 867 F.2d 1271 (11th Cir.1989), the Court cited several cases from outside the Eleventh Circuit in which a prior suicide attempt was known to the defendants. *Id.* at 1275. The histories in some of these cases preceded death by a few weeks to a few

months. *See Cabrales v. County of Los Angeles,* 864 F.2d 1454, 1457 (9th Cir.1988)(18 days), *vacated on other grounds,* 490 U.S. 1087, 109 S.Ct. 2425, 104 L.Ed.2d 982 (1989); *Partridge v. Two Unknown Police Officers,* 751 F.2d 1448, 1454 (5th Cir.1985)(several months)(subsequent history omitted); *Guglielmoni v. Alexander,* 583 F.Supp. 821, 824–25 (D.Conn.1984)(two months). However, the Court did not embrace the concept that a remote suicide history can satisfy the strong likelihood requirement, but cited these cases only for the proposition that all cases in which liability has been found involved a past suicide attempt or threat.

At any rate, each of these cases is distinguishable. For example, in *Cabrales* the attempt and the successful suicide occurred during the same period of confinement and were sandwiched around other violent behavior. 864 F.2d at 1457. In *Partridge,* the Court's original opinion vaguely referencing a previous suicide attempt was withdrawn and replaced by another opinion devoid of such reference. *Partridge v. Two Unknown Police Officers,* 791 F.2d 1182, 1183 & n. 2, 1185 (5th Cir.1986). In *Guglielmoni,* there was a second suicide attempt four days before death, during the same period of confinement. 583 F.Supp. at 825.

**17.** Given the Court's disposition, the defendants' motions to exclude, (Docs.44, 46), as well as their second motion to strike, (Doc. 62), are **moot.**

to avoid summary judgment. Walter Van Davis testified only that "persons that are a suicide risk normally stay a suicide risk," (Davis Deposition at 95), a proposition which, even if true, addresses neither the *degree* of suicide risk at any point in time nor the likelihood that Holland *himself,* as opposed to some hypothetical detainee, would kill himself on July 16, 1998. Again, "[s]imple knowledge that the detainee fits the profile of a high suicide risk is not enough." *Barber v. City of Salem,* 953 F.2d at 239. Dr. Riddick testified only that, in his experience, "a number of" suicides were in fact preceded by one or more unsuccessful attempts, without drawing any conclusions therefrom. (*Id.,* Riddick Deposition at 21). Cecil Moses offered no testimony concerning the relationship between remote suicide attempts and later jail suicides.

Nor do the circumstances of this case overcome the remoteness of Bowens' suicide history. On April 3, 1999, Bowens was foaming at the mouth and making animal noises unintelligible even to her sisters. She was extraordinarily and irrationally violent for an extended period. After she calmed down, and again on May 24, 1999, she related that her conduct was caused by cocaine withdrawal. Bowens' conduct on May 24 and 25, 1999 could not have been more different. Witnesses repeatedly observed her smiling, laughing and joking, and she gave no indication of being under the influence of drugs. Both her father and her live-in boyfriend of over three years found her to be perfectly normal, and neither had the slightest suspicion that Bowens was suicidal. In short, even if Bowens' April 3, 1999 suicide attempt, despite its remoteness, could have created a strong likelihood that similar behavior would presage another attempt, Bowens did not display such behavior on May 25, 1999.

■ The plaintiffs are left to grasp at straws.[18] Bowens was still HIV positive and an abuser of drugs and alcohol in May 1999, but these are merely stressors that can give rise to a suicidal intent, not manifestations of such an intent as plainly required by binding precedent. Bowens had directed several acts of violence against others, most recently on April 10, 1999, but even homicidal tendencies do not support a strong likelihood of an imminent suicidal act. *Williams v. Lee County,* 78 F.3d at 493. For at least five years, Bowens had periodically heard voices telling her to kill herself, but she did not follow the voices' suggestions and did not even hear them unless experiencing a seizure and/or cocaine withdrawal.

The plaintiffs note that Bowens' blood carried metabolites of cocaine. To the extent they suggest that Bowens went into cocaine withdrawal and reverted to her April 3, 1999 conduct in the final hour of her life, they have identified no evidence that this occurred. Nor have they identified any evidence that any representative of the Atmore Police Department was aware that Bowens had ingested cocaine or had fallen into withdrawal. Nor have they expounded any evidence or theory under which the police department could have been charged with a constitutional duty of anticipating and discovering such a rapid, complete disintegration.

The plaintiffs fault the defendants for not contacting the Southwest Alabama Mental Health Center concerning Bowens. (Doc. 57 at 22, 28, 30). As a threshold matter, the plaintiffs have identified no constitutional duty to do so. At any rate,

---

**18.** They wisely do not suggest that Bowens' 1994 suicide attempt could raise a strong likelihood of suicide on May 25, 1999.

even had Bryars known all the additional information contained in the records submitted by the plaintiffs but unknown to any member of the police department, the information would not have shown a strong likelihood of Bowens' suicide on May 25, 1999. On the contrary, these records further confirm that Bowens became violent, heard voices and/or had suicidal thoughts principally, if not exclusively, when experiencing cocaine withdrawal and/or a seizure.[19]

The ambiguities of the foregoing evidence on which the plaintiffs rely amply illustrates the need for the unambiguous marker of a recent suicide attempt or threat to support the requisite strong likelihood of an imminent suicide. Because the plaintiffs cannot establish a jury question as to whether such a strong likelihood existed on May 25, 1999, they cannot establish that Bowens acted with deliberate indifference to such a strong likelihood. Accordingly, the plaintiffs' Section 1983 claim against Bryars is due to be dismissed.[20]

## C. Chief McKinley.

 Supervisory liability under Section 1983 can arise in only two classes of cases: (1) "when the supervisor personal-

ly participates in the alleged constitutional violation"; or (2) "when there is a causal connection between actions of the supervisory official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir.1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991); *accord Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). It is uncontroverted that Chief McKinley did not personally participate in the detention of Bowens in May 1999. Instead, the plaintiffs challenge Chief McKinley's alleged failure to promulgate and/or enforce adequate policies for the identification of suicidal detainees, the exchange of information among employees concerning the suicidal tendencies of detainees, and the handling of suicidal detainees. They also challenge his alleged failure adequately to train employees in these particulars.

 An element of the plaintiffs' claim against Chief McKinley is that his "conduct was causally related to the subordinate's constitutional violation." *Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir.1995). As discussed in Part I.B, however, the plaintiffs cannot prove this element because, since they have not established a jury issue as to whether Bowens possessed

19. With little discussion and less analysis, the plaintiffs casually suggest that the defendants breached a "duty to seek out the appropriate psychiatric and medical care for a potentially suicidal inmate." (Doc. 57 at 18, 20). Viewed as a claim of deliberate indifference to Bowens' capacity for suicide, the argument fails for lack of a strong likelihood of suicide on May 25, 1999. Viewed as a claim of deliberate indifference to Bowens' serious medical needs, *see generally Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), "[d]elay in access to medical attention can violate the Eighth Amendment," *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th Cir.1994), but only if the condition is life-threatening or will obviously deteriorate if not quickly treated, the delay actually worsens the medical condi-

tion, and the delay is unjustified. *Id.* at 1187–89. Applying these standards, the defendants breached no duty on April 3, 1999 because Bowens' violent episode sprang from causes (cocaine withdrawal) that could not be repeated in confinement, her confinement was brief, and her pre-existing mental and substance abuse conditions were not worsened during her confinement. Similarly, the defendants breached no duty in May 1999 because Bowens manifested no need for treatment and because her pre-existing conditions were not worsened by any delay.

20. Because no triable issue exists as to the existence of a constitutional violation, it is unnecessary to consider the defendants' qualified immunity argument.

a "strong likelihood" of taking her life on the night of May 25, 1999, Bryars had no constitutional duty to take any precautions to prevent her suicide.

It may be true that, had Chief McKinley promulgated and enforced better policies and better trained the department's employees regarding them, Bryars would have possessed all the information concerning Bowens that various members of the police department possessed in part. It may also be true that, had Bryars possessed this information, he would have taken steps sufficient to prevent Bowens from committing suicide. If so, Chief McKinley's failures would be a cause of Bowens' death, but they would not be a cause of a *constitutional violation* causing her death because, even had Bryars possessed this information, he would have been under no constitutional duty to take preventative steps.[21]

For lack of an underlying constitutional violation by Bryars, the plaintiffs' Section 1983 claim against Chief McKinley is due to be dismissed.

### D. City of Atmore.

 The plaintiffs argue that the City is liable due to Chief McKinley's challenged policies and failure to train. "[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)(emphasis omitted); *accord Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1295 (11th Cir.2000); *Hardin v. Hayes*, 52 F.3d 934, 938 (11th Cir.1995). As with Chief McKinley, the absence of an underlying constitutional violation by Bryars precludes the imposition of Section 1983 liability on the City. Accordingly, the plaintiffs' Section 1983 claim against the City is due to be dismissed.

### II. Sections 1985(3) and 1986.

The defendants point out that the plaintiffs have no evidence that the defendants, or any of them, entered a conspiracy to deprive Holland of his constitutional rights. (Doc. 37 at 41–42). The plaintiffs offer no such evidence in response. Accordingly, their Section 1985(3) claim is due to be dismissed.[22]

 "Section 1986 claims are therefore derivative of § 1985 violations.... The text of § 1986 requires the existence of a § 1985 conspiracy.... [W]e agree with

---

**21.** The Court's ruling might be different if the facts relied on by the plaintiffs showed that Bowens had a strong likelihood of committing suicide at the time she died, and if the absence of a constitutional violation by Bryars were due only to his failure to be aware of facts, known to other members of the department, establishing this strong likelihood. It is far from clear that, when the existence of a constitutional violation by those dealing directly with a detainee depends on their subjective awareness of certain facts, a city or its policymakers may effectively preclude liability by policies promoting employee ignorance. The present case does not require resolution of this issue.

**22.** This claim is suspect on other grounds as well. Most obviously, Section 1985(3) reaches only conspiracies motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Failure to plead such a class-based animus is grounds for dismissal. *E.g., GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359, 1370 n. 11 (11th Cir.1998). The plaintiffs have alleged no such class-based animus; even had they alleged a class of detainees or suicidal detainees, they have made no showing that such a group can and does constitute a "class" within Section 1985(3). It has been only two years since the Eleventh Circuit recognized that *any* class other than racial can satisfy Section 1985(3). *See Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1337–40 (11th Cir.1999)(class of women).

the district court that § 1986 requires a violation of § 1985...." *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997). Accordingly, because the plaintiffs' Section 1985(3) claim fails for want of a conspiracy, their Section 1986 claim is due to be dismissed as well.

### III. State Law Claims.

■ "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In exercising its discretion, the Court is to consider "'concerns of comity, judicial economy, convenience, fairness, and the like.'" *Crosby v. Paulk*, 187 F.3d 1339, 1352 (11th Cir.1999)(quoting *Roche v. John Hancock Mutual Life Insurance Co.*, 81 F.3d 249, 257 (1st Cir.1996)); *see also Baggett v. First National Bank*, 117 F.3d 1342, 1352 (11th Cir.1997).

However, "'if the federal claims are dismissed prior to trial, [*United Mine Workers v.] Gibbs*, [383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)] strongly encourages or even requires dismissal of state claims.'" *Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11th Cir.)(quoting *L.A. Draper & Son v. Wheelabrator–Frye, Inc.*, 735 F.2d 414, 428 (11th Cir.1984))(applying *L.A. Draper* to Section 1367(c)(3)), *cert. denied*, 528 U.S. 820, 120 S.Ct. 63, 145 L.Ed.2d 55 (1999); *see also Baggett v. First National Bank*, 117 F.3d at 1353 (because "[s]tate courts, not federal courts, should be the final arbiters of state law," dismissal of state law claims is strongly encouraged when federal claims are dismissed prior to trial); *Graham v. State Farm Mutual Insurance Co.*, 193 F.3d 1274, 1282 (11th Cir.1999)("If no federal claim survives summary judgment, the court sees no reason why the other claims should not be dismissed or remanded pursuant to 28 U.S.C. § 1367(c)(3).*"*). Any

such dismissal should be without prejudice "so that the claims may be refiled in the appropriate state court." *Crosby v. Paulk*, 187 F.3d at 1352; *see also* 28 U.S.C. § 1367(d).

■ Because all federal claims have been dismissed prior to trial, because state court should be the final arbiter of the plaintiffs' tort claims, and because no countervailing considerations outweigh these circumstances, the plaintiffs' state law claims under Counts Three and Four will be dismissed without prejudice.

### CONCLUSION

The alleged actions and inactions of the defendants and others in connection with Bowens' death and the operation of the Atmore city jail are less than exemplary. They may even amount to negligence, a question as to which this Court has and expresses no opinion. The United States Constitution, however, is not a fountainhead of tort law, in which every wrong has a remedy, but a purposefully limited restraint on the worst excesses of government action. The requirements of liability for violation of a prisoner's constitutional rights are stringent, and in this case the plaintiffs cannot satisfy them. Accordingly, the defendants' motion for summary judgment is **granted** as to all federal claims against them. The plaintiffs' state law claims are **dismissed without prejudice**. Judgment shall be entered accordingly by separate order.